**QUALITY EDUCATION FOR ALL CHILDREN, INC., et al., Plaintiffs,**

v.

**SCHOOL BOARD OF SCHOOL DISTRICT #205 OF WINNEBAGO COUNTY, ILLINOIS, Defendants.**

**No. 70 C 16.**

United States District Court, N. D. Illinois, W. D.

Aug. 16, 1973.

Donald S. Frey, Frey Wilcher & Lapidos, Evanston, Ill., for plaintiffs.

John S. McCreery, Springfield, Ill., for Supt. of Public Instruction.

Dale F. Conde, Pedderson, Menzimer & Conde, Rockford, Ill., for School Board.

## MEMORANDUM OPINION AND ORDER

BAUER, District Judge.

This cause comes on the plaintiffs' petition for a temporary injunction restraining the School Board of School District # 205 of Winnebago County, Illinois ("School Board") from carrying forward on a plan known as the "Voluntary Desegregation Program" approved by the School Board at its meeting on April 30, 1973.

The named plaintiffs are all citizens of the United States and residents of School District # 205 of Winnebago County, Illinois. Some of the named plaintiffs are individuals while others

are community organizations which are allegedly voluntary associations of citizens, most of whom are also citizens of the school district and taxpayers of the State of Illinois. The defendant is the School Board of School District # 205 of the Winnebago County Schools, State of Illinois.

The instant suit is a class action, brought by the plaintiffs (*qua* individual taxpayers and voluntary associations) on behalf of other residents and taxpayers similarly situated in School District # 205 of Winnebago County, State of Illinois ("School District"), pursuant to Rule 23(a) and 23(b)(2), Federal Rules of Civil Procedure. The class represented by the named plaintiffs allegedly consists of all residents of the School District including both black and white citizens.[1]

The named plaintiffs, in their complaint, have set forth the following eight separate causes of action and factual allegations to support them:

1. The School District is Not in Compliance With the State's Rules on Equal Educational Opportunities.

   The defendant School District has failed to comply with the "Rules Establishing Requirements and Procedures for the Elimination and Prevention of Racial Segregation in Schools" issued on November 22, 1971 by Michael J. Bakalis, Superintendent of Public Instruction, State of Illinois.[2] The

---

1. There has been no determination to date as to whether the instant action can be maintained as a class action. The plaintiffs allege: (1) that the purported class is so numerous that joinder of all members is impractical; (2) that there are questions of law and fact common to the class; (3) that claims of the representative plaintiffs are typical of the claims of the class; (4) that the representative plaintiffs will fairly and adequately protect the interests of the class; and (5) that the parties defendant have acted or refused to act on grounds generally applicable to plaintiffs as a class.

2. This directive from the Superintendent of Public Instruction provides, in relevant part:
   "5. *Submission and Contents of Plan*
   5.1 Within ninety (90) days following the receipt of a notification of non-compliance the recipient School authority shall submit to the Superintendent of Public Instruction a plan to achieve compliance with the requirements of these Rules.
   5.2 Each plan shall contain: (a) an explicit, unqualified commitment by the School Authority to fulfillment of the requirements of these Rules; (b) a detailed description of the specific actions to be taken to correct each specified deficiency, together with a showing of the intended effect of each action proposed; (c) with respect to the entire plan, and each specific action proposed in the plan, a timetable showing dates of initial implementation and completion.
   5.3 In the formulation of plans to eliminate and prevent racial segregation in schools, School Authorities shall consider and employ all methods that are educationally sound and administratively and economi-

cally feasible, including but not limited to: school pairings and groupings; grade reorganization; alteration of school and school district attendance zones and boundaries; pupil reassignments and such optional transfers as are consistent with these requirements; establishment of educational parks and plazas; rearrangements of school feeder patterns; voluntary metropolitan or inter-district cooperative plans; specified or "magnet" schools; differentiated curricular or other program offerings at schools serving children predominantly of different racial groups at the same grade level; reassignments of faculty, staff, and other personnel, affirmative recruitment, hiring, and assignment practices to insure that each system's personnel corps, as well as the faculty, staff, and other personnel at all attendance centers within systems, become and remain broadly representative racially.
   5.4 Plans that are based upon parent-pupil choices, or are otherwise voluntary or optional, shall constitute compliance with the requirements of these Rules only to the extent that they actually eliminate and prevent racial segregation in schools because of color, race or nationality.
   5.5 All decisions by School Authorities concerning selection of sites for new schools and additions to existing facilities shall take into account, and give maximum effect to, the requirements of elimination and preventing racial segregation in schools because of color, race or nationality.
   5.6 All plans to effect school desegregation and integration shall be equitable and non-discriminatory. Within the constraints imposed by feasibility and educational soundness, inconvenience or burdens occasioned

defendant School Board has received a statement of non compliance from the Illinois Superintendent of Public Instruction and has not complied with the said notice, as required by the directive, to achieve quality integrated education in Rockford free of illegal segregated educational practices. The defendant School Board adopted a "Voluntary Desegragation Plan" on April 30, 1973 which does not comply with the Rules set forth in the Superintendent of Public Instruction's directive of November 22, 1971. The School Board's plan allegedly does not set forth time tables, places unequal burdens of transfer and the like upon minority students and relies upon voluntary integration plans which have been shown not to work thus assuring the continuance of segregation practices in violation of the constitution and statutes of the United States.

2. School Board Practices and Election Procedure Violate State Laws.

The manner of election of individuals to the School Board is racially discriminatory, for the election of School Board members, pursuant to Sec. 9–7 of Chapter 122 of the Illinois Revised Statutes of 1971, allowing candidates to be chosen from the entire district assures an all-white school board or a segregation-oriented school board to be elected. In the fact of existing racial and economic residential segregation in the Rockford School District, every school board election assures the election of a majority of board members unresponsive to the needs of minority students and the overriding urgency to achieve quality integrated education.

3. Present Attendance Boundaries Create Racial Imbalance.

The present attendance boundaries for assigning students to the five senior high schools, the six junior high schools, and the 60 elementary schools of the Rockford School District produce a racial imbalance or segregation in the student bodies throughout the system. The boundaries have caused students who are black to go to schools with a larger percentage of black students than the overall citywide average of 15 percent, although another school nearer to such students would have offered a better proportional racial balance. The present attendance boundaries produce a level of racial segregation resulting in unequal educational opportunities for

by desegregation should be shared by all and not borne disproportionately by pupils and parents of racially identifiable groups. 5.7 School Authorities shall not adopt or maintain pupil grouping or classification practices which result in racial segregation of pupils within schools for a substantial portion of the school day. 5.8 All plans shall include specific affirmative proposals to insure that the integration process provides an effective learning environment for all children based upon mutual cultural and personal respect among all racial groups. Such proposals may relate, for example, to curriculum revision, in-service training of personnel, and compensatory programs to enable pupils to overcome the adverse educational effects of racial segregation.

5.9 All plans shall contain provisions to the effect that they are subject to continuing review and evaluation by the School Authority, and that amendments to improve their effectiveness will be adopted and implemented on a continuing basis; provided, however, that any proposed amendment whose implementation would result in racial resegregation of any school or classroom, shall not take effect with respect to plans in Rule 6, below. Submissions of proposed amendments shall be accompanied by materials setting forth the reasons underlying the proposals and their projected effects upon the racial composition of all affected schools and classrooms."

many children, black and white. The present attendance boundaries cause an increase in the racial identifiability of various schools.

4. Present Attendance Boundaries Create Imbalance of Under Achievers.

The present system of attendance boundaries has caused students who are at low achievement levels to be attending schools where there are larger numbers of low achiever students than the city-wide average, although a school with a low percentage of low achievement level students is near-er at hand. The present attend-ance boundaries produce a racial and achievement level segregation, resulting in unequal educational opportunities for many children, black and white. The present at-tendance boundaries cause an in-crease in the racial identifiability of various schools and an increase in low achieving or economic iden-tifiability of various schools.

5. Bussing of Students In Discrimin-atory Manner.

The bussing of students within the Rockford School District is performed in a racially discrimin-atory manner. Black children are bussed out of predominantly black areas but white students are not bussed in the same manner. Bussing is actually done within the Rockford School District to continue segregation rather than to produce integration. Further, children are bussed in order to produce clusters of students of the same achievement level rather than to integrate students of all achievement levels. The Rockford School Board has sought to use its neighborhood school policy and its policy against forced cross-the-riv-er bussing to explain its failure to integrate students, teachers and staff members. The Rockford School Board currently has a plan of bussing in which primarily black students are bussed, and this produces more racial identifiabili-ty and racial segregation.

6. Racial Discrimination in Faculty Assignments.

There is racial imbalance or segre-gation in the faculty assignments in the senior high schools, junior high schools, and elementary schools of the Rockford School District on a racially segregated basis, namely, a greater propor-tion of black faculty members are in those schools that have a great-er proportion of black students.

7. Racial Discrimination in the Con-struction Program.

There is racial imbalance or segre-gation in the construction pro-gram of the senior high schools, the junior high schools and the el-ementary schools of the Rockford School District. Schools housing a greater proportion of black stu-dents than the citywide average are those schools which should have been removed because of their age, but were remodeled, thus perpetuating the imbalance. New schools were built in the cen-ter of all-white areas and not on the borders of white-black areas, where more racial balance might have been achieved. Portable schoolrooms were purchased and/or transferred to schools with a view toward maintaining racial imbalance or imbalance of low-achievers rather than coupled with alteration of attendance bounda-ries to permit a more balanced student body, both racially and in terms of achievement levels. A $17 million dollar bond issue in 1967 was promoted with represen-tations to the public that the mon-ies would be used to build better schools on both sides of the river running through Rockford, but the facts have shown that most of the monies were used in white areas for high achieving students.

8. Curriculum Programs are Racially Discriminating.

There is a racial imbalance or segregation in educational opportunities produced by the curriculum programs in the elementary schools, junior high schools and senior high schools of the Rockford School District. In Guilford High School nothing has been offered by way of a black studies course. In Wilson, Lincoln and Roosevelt Junior High Schools there is no separate program of black studies offered at the schools, and in the other schools where black studies are offered, all students are not required to take such studies. At Auburn High School, where a predominant number of the students are black, students in this school (in contrast to the other high schools of the city) are denied the right to take SAT College Entrance tests. More than twice as much money is spent on counseling facilities for the students in high schools which have a practically all-white population than in other high schools where there is a large percentage of black students. In Wert High School a black studies course was offered for the first time last year, but there are no plans to increase the number of courses this coming year.

The plaintiffs have asked this Court to restrain the defendants from proceeding with their Voluntary Desegregation Plan; to require the defendant School Board to re-examine its School Board election procedure and practices in light of Illinois Constitutional requirements; to enjoin the defendants, their agents, officers, employees, successors and all persons in active consort or participation with them from discriminating on the basis of race, color or achievement level regarding attendance boundaries, bussing, faculty assignment, school construction programs or curriculum in the operation of the Rockford Public School System.

It is important for the proper disposition of the instant controversy to comprehend the defendant's Voluntary Desegregation Plan, which provides: [3]

1. The entire staff, certificated and non-certificated, should be integrated as rapidly as possible. The percentage of minority employees should be 15% of the total. This would include central administration personnel, administrators, teachers, clerks, secretaries, building engineers, custodians, trademen, food service workers, and all classifications of para-professional personnel. The time schedule for the completion of the integration of the staff will be three to five years and is to begin immediately.

2. Cluster elementary schools on a voluntary individual basis, under the direction of the administration.

3. Pair elementary schools on a voluntary individual basis under the direction of the administration.

4. Close one elementary school (Muldoon) and transfer children to four other elementary schools (Bloom, Guilford Center, Johnson, Spring Creek) with an option to remain in the closest neighborhood school.

5. Establishment of four magnet schools: Martin Luther King, Barbour, Welsh and an alternative school.

6. Identify seven elementary schools as target schools and two middle schools as target schools: Beyer, Dennis, Ellis, Henrietta, Lathrop, Lincoln Park, McIntosh, Washington and Wilson.

7. Open enrollment for all middle schools provided space is available

3. See Plaintiffs' Exhibit 15, and the testimony of Mrs. Smith and Dr. Salisbury at the Hearing on the Temporary Restraining Order on July 2 and 3, 1973.

and that such transfers would contribute to desegregation.

8. Open enrollment for all high schools provided space is available and that such transfers would contribute to desegregation.

9. Open enrollment to be permitted throughout the entire district provided space is available for such transfers and that they contribute to desegregation.

10. Students transfers would be accepted from May 1—July 1, 1973. Forms would be provided through schools for all parents interested in reassignment of their youngsters.

11. Application for assistance under the Emergency School Aid Act will include inservice education for all members of the staff and specific recommendations for:

    a. the improvement of mathematics;

    b. the improvement of reading;

    c. provisions for additional supportive services;

    d. community and human relations development; and

    e. equipment, materials, and supplies to support the program.

The following relevant facts are instructive and illustrative of the instant controversy and the problem of minority isolation in the Rockford School District. These facts were developed by this Court from its analysis of testimony and statistical evidence presented to this Court at the hearing on the instant petition held July 2–3, 1973:

1. Dr. Michael J. Bakalis, the Illinois Superintendent of Public Instruction, in his letter of September 12, 1972, informed Dr. Robert Salisbury, Superintendent of School District # 205, that there were at least 13 schools in his district which failed to comply with the State Superintendent's "Rules Establishing Requirements and Procedures for Elimination and Prevention of Racial Segregation in Schools."[4] The State Superintendent cited the following schools for non-compliance: Barbour, Beyer, Dennis, Ellis, Haskell, Henrietta, Lathrop, Lincoln Park, McIntosh, Muldoon, Rock River, Washington and Wilson.[5] Dr. Bakalis noted that the state goal is for an individual district to achieve a fifteen percent range above or below the percent of racial minorities in the district as a whole. He further stated that the concern with the assignment of children is only one aspect of a much more comprehensive process that should include community education, curriculum revision, as well as faculty integration.

2. In the school year of 1971–72 there were a total of 5,362 minority students in the School District and 2,386 (44.4%) of those minority students were attending schools in which minority attendance exceeded 50% of the enrollment. It is projected by the School Board that in the school year of 1973–74 there will be a total of 6,233 minority students in the School District and 2,758 (44.2%) of those minority students will be attending schools in which minority attendance exceeds 50% of the enrollment.[6] This problem of minority group isolation can be brought into clearer focus by examining minority enrollment in the schools cited for non-compliance with state standards. The following table compares minority enrollment in non-complying schools for

4. See Defendant's Exhibit 3.

5. The State Superintendent also cited Page Park School, but it was closed following the

opening of a new school (so is not included in this listing).

6. These statistics are based on an analysis of the data contained in Defendant's Exhibit 12, page 1.

the school year 1972–73 to the School Board's projection of minority enrollment in those schools for the school year of 1973–74: [7]

## TABLE 1

### MINORITY ENROLLMENT IN NON-COMPLYING SCHOOLS

| School | School Year 1972-73 | | | School Year 1973-74 | | |
|---|---|---|---|---|---|---|
| | Total enroll-ment | No. of minority students | % of minority enrollment | Total enroll-ment | No. of minority students | % of minority enrollment |
| Barbour | 431 | 317 | 73.5 | 431 | 317 | 73.5 |
| Beyer | 355 | 137 | 38.5 | 355 | 137 | 38.5 |
| Dennis | 400 | 370 | 92.5 | 400 | 370 | 92.5 |
| Ellis | 435 | 343 | 78.8 | 408 | 316 | 77.4 |
| Haskell | 432 | 285 | 65.9 | 432 | 284 | 65.7 |
| Henrietta | 178 | 136 | 76.4 | 178 | 132 | 74.1 |
| Lathrop | 305 | 219 | 71.8 | 305 | 319 | 71.8 |
| Lincoln Pk. | 532 | 299 | 56.2 | 532 | 299 | 56.2 |
| McIntosh | 459 | 171 | 37.2 | 459 | 171 | 37.2 |
| Muldoon (to be closed '73-'74) | 290 | 226 | 77.9 | 290 | 226 | 77.9 |
| Rock River | 456 | 195 | 42.7 | 456 | 195 | 42.7 |
| Washington | 579 | 350 | 60.4 | 579 | 350 | 60.4 |
| Wilson | 1236 | 610 | 49.3 | 1236 | 509 | 49.2 |

[A 7723]

It is clear from the above statistics that the hard core minority isolation existing in the School District does not show signs of rapidly changing.

7. The School Board projects that in the school year 1973–74 there will be 6,233 minority students out of 41,364 total student enrollment or 15.0% (Defendant's Exhibit 12, page 1). According to the State Superintendent's standards, minority enrollment of a school in School District # 205 can range from 0% to 30%. The statistics in this table come from an analysis of data contained in Defendant's Exhibit 12, pages 9 through 15.

3. School District No. 205 has 1,679 school teachers. Of these 100 or 5.95% are minority teachers; further, 4.74% of all high school teachers are minority teachers, 7.55% of all middle school teachers are minority teachers, and 5.63% of all elementary school teachers are minority teachers. It should be noted that minority students represent at least 15% of the student enrollment.

The School Board, as part of its Voluntary Plan for School Desegregation, has a five year program to increase minority staff members. This program is best stated by means of the following three charts: [8]

## CHART I

### TARGET GOALS FOR 15% EMPLOYMENT OF MINORITY TEACHERS BY 1978 - ELEMENTARY

**(Computed on base total of 852.0 elementary teachers)**

Number of Minority Teachers

[A 7724]

---

8. See Defendant's Group Exhibit 15.

## CHART II

### TARGET GOALS FOR 15% EMPLOYMENT OF MINORITY TEACHERS BY 1978 - MIDDLE SCHOOL

(Computed on base total of 335.5 middle school teachers)

Target Year and Net Gain

| 1972 – 1973 7.5% | +25 | 1978 Goal 15% | +52 |

| 1973–1974 | +6 | 31  9.2% |

| 1974–1975 | +5 | 36  10.7% |

| 1975–1976 | +5 | 41  12.2% |

| 1976–1977 | +6 | 47  14% |

| 1977–1978 | +5 | +52  15.4% |

[A 7725]

Number of Minority Teachers

CHART III

TARGET GOALS FOR 15% EMPLOYMENT OF
MINORITY TEACHERS BY 1978 - HIGH SCHOOL

(Computed on base total of 487. 0 high school teachers)

[A 7726]     Number of Minority Teachers

The School Board's good will in carrying out this program can be demonstrated by the fact that as of June 25, 1973 the School Board has either sent letters of intent or have hired 48 people of whom 14 or 29% are members of a minority.[9]

4. The plaintiffs in their complaint have made allegations that relatively poor facilities, materials and teachers are utilized in schools of high minority enrollment. Numerous witnesses at the hearing conducted on July 2 and 3, 1973, expressed the opinion that such conditions did exist in School District # 205. The members of the American Association of University Women and the League of Women Voters completed a survey of elementary school needs.[10] This survey concluded, *inter alia*, that the southeast quadrant of the city (an area of high minority enrollment) has schools that suffer from a lack of materials and up-to-date texts; that buildings in the southeast section are some-

9. See Defendant's Exhibit 16.

10. See Defendant's Exhibit 2 (the Direct Line Supplement dated November 28, 1972).

what crowded and special purpose rooms are lacking. However, the survey also noted that the staff and principals are "well qualified" and secretarial and custodial help seems adequate. The School Board has submitted data that indicates that at least the amount of teacher's training in all schools, both those with high and low minority enrollment is, practically speaking, identical. The following tables demonstrate such a statistical finding: [11]

TABLE 2

COMPARISON OF TEACHER TRAINING BETWEEN
WASHINGTON AND MARSH MIDDLE SCHOOLS' STAFFS

| SCHOOL | B.A. | B.A. +10 | B.A. +20 | M.A. | M.A. +10 | M.A. +20 | M.A. +30 | |
|---|---|---|---|---|---|---|---|---|
| Washington | 18 44% | 4 10% | 11 27% | 1 2.4% | 2 4.9% | 2 4.9% | 3 7.3% | 41 |
| Marsh | 9 29% | 4 13% | 8 26% | 6 19.4% | 1 3.2% | 1 3.2% | 2 6.5% | 31 |

Washington: 515 students, 316 minority or 61.36%
Marsh: 561 students, 4 minority or .71%

[A 7727]

11. See Defendant's Group Exhibit 17.

COMPARISON OF TEACHER TRAINING BETWEEN
WILSON AND EISENHOWER MIDDLE SCHOOLS' STAFFS

| SCHOOL | B.A. | B.A. +10 | B.A. +20 | M.A. | M.A. +10 | M.A. +20 | M.A. +30 | |
|---|---|---|---|---|---|---|---|---|
| Wilson | 18 / 29% | 14 / 21% | 13 / 19% | 5 / 7.5% | 9 / 13% | 3 / 4.5% | 5 / 7.5% | 67 |
| Eisenhower | 18 / 29% | 8 / 12.9% | 14 / 22.6% | 7 / 11.3% | 6 / 9.7% | 3 / 4.8% | 6 / 6.6% | 62 |

Wilson:     1169 students, 575 minority or 49.19%
Eisenhower: 1238 students, 14 minority or 1.13%
[A 7728]

COMPARISON OF TEACHER TRAINING BETWEEN
AUBURN AND GUILFORD HIGH SCHOOLS' STAFFS

| SCHOOL | B.A. | B.A. +10 | B.A. +20 | M.A. | M.A. +10 | M.A. +20 | M.A. +30 | |
|---|---|---|---|---|---|---|---|---|
| Auburn | 18 / 17.5% | 13 / 12.6% | 14 / 13.6% | 10 / 10% | 10 / 10% | 5 / 5% | 33 / 32% | 103 |
| Guilford | 21 / 17% | 13 / 10.6% | 7 / 6% | 7 / 6% | 12 / 10% | 10 / 8% | 46 / 37% | 123 |

Auburn:   1767 students, 537 minority or 30.39%
Guilford: 2209 students, 20 minority or .905%
[A 7729]

5. Many witnesses who testified for the plaintiffs expressed the opinion that schools with high minority enrollment also mean high minority underachievement. The following statistics seem to indicate higher underachievement among minority students in schools cited for non-compliance with state standards: [12]

TABLE 3

MEAN SCORES OF 5th GRADE STUDENTS
(for percentages of minority enrollment see Table 1)

| SCHOOL | Minority | | Non-Minority | | All Students | |
|---|---|---|---|---|---|---|
| | Reading | Math | Reading | Math | Reading | Math |
| Barbour | 36.77 | 34.89 | 46.30 | 40.76 | 38.80 | 36.14 |
| Beyer | 30.63 | 44.05 | 36.88 | 44.60 | 34.18 | 44.30 |
| Dennis | ------- | ---- NO | 5th GRADE | ----- | ------- | ------- |
| Ellis | ------- | ---- NO | 5th GRADE | ----- | ------- | ------- |
| Haskell | 31.67 | 31.92 | 38.54 | 35.63 | 34.70 | 33.56 |
| Henrietta | ------- | ---- NO | 5th GRADE | ----- | ------- | ------- |
| Lathrop | 45.14 | 47.00 | 47.08 | 46.16 | 45.63 | 46.63 |
| Lincoln Pk. | 28.87 | 29.24 | 42.12 | 37.47 | 33.36 | 32.03 |
| McIntosh | 30.44 | 27.27 | 41.31 | 36.95 | 35.76 | 32.01 |
| Muldoon | 29.21 | 29.61 | 40.11 | 28.92 | 31.39 | 29.47 |
| Rock River | 32.30 | 36.19 | 41.69 | 35.05 | 37.75 | 35.57 |
| MEAN SCORES OF 7th GRADE STUDENTS | | | | | | |
| Washington | 31.94 | 33.92 | 38.76 | 39.59 | 35.20 | 36.64 |
| Wilson | 27.68 | 34.59 | 38.88 | 42.57 | 33.83 | 38.97 |
| All City | 29.63 | 34.30 | 49.94 | 53.27 | 47.52 | 51.01 |

[A 7730]

———◆———

12. See Defendant's Exhibit 12, pages 72–95, and are compiled from Metropolitan Achievement tests which were administered in grades 5 and 7 during October and November 1972.

Statistics submitted by the School Board clearly show that given special programs and sufficient funds under-achievers can drastically improve their scholastic performance.[13]

6. Testimony and data seemingly reveal that schools with higher minority enrollments also have higher drop-out rates. For example, data from the individual high schools indicate that Auburn and West, which had respectively 30.7% and 15.7% minority enrollment in 1972–73, had a considerably higher drop-out rate over the year than Guilford, which had only .9% minority enrollment. It should be noted that the high schools in School District # 205 have considerably less minority isolation than the elementary or middle schools. The following table clearly indicates the drop-out problem:

TABLE 4

DROP-OUT RATE IN SCHOOL
DISTRICT #205 FOR GRADES 9-12

| School | Percent of minority enrollment 1972-73 | Percentage of drop-outs to the total enrollment | | |
|---|---|---|---|---|
| | | 1970-71 | 1971-72 | 1972-73 |
| Auburn | 30.7 | 11.0 (227) | 12.5 (252) | 12.1 (237) |
| East | 10.4 | 8.0 (192) | 7.4 (186) | 7.2 (195) |
| Guilford | .9 | 4.0 (110) | 2.6 (68) | 2.2 (55) |
| Jefferson | 7.0 | 8.0 (167) | 10.9 (258) | 10.9 (247) |
| West | 15.7 | 7.0 (164) | 9.2 (205) | 9.9 (946) |

[A 7731]

Although some witnesses testified that many of the drop-outs were members of a minority, no data has been submitted to this Court concerning the percentage of drop-outs who were members of a minority. Thus, the role that

13. The following statistics demonstrate the improvement that can be made by underachievers by comparing students in the Federal Title I Program in School District #205 for the school year 1970–71 with Non-Title I students:

|  | Title I | Non-Title I |
|---|---|---|
| Grade 2 | 32% showed an increase of more than 1 year per 7 months attendance. | 18% showed an increase of more than 1 year per 7 months attendance. |
| Grade 3 | 44% showed an increase of more than 1 year per 7 months attendance. | 17% showed an increase of more than 1 year per 7 months attendance. |
| Grade 4 | 43% showed an increase of more than 1 year per 7 months attendance. | 40% showed an increase of more than 1 year per 7 months attendance. 40% showed no gain. |

See Defendant's Exhibit 13.

minority isolation plays in drop-outs cannot be adequately assessed at this time.

7. The plaintiffs charge that the defendant has drawn attendance boundaries so as to foster minority isolation.[14] The data does show a problem with minority isolation, at least in so far as the schools which were cited by Dr. Bakalis for non-compliance with state standards. The *School Board has stated that six factors enter into the drawing of school attendance boundaries:*

1. educational needs of students;
2. proximity of students to school;
3. safety of students;
4. ages of students served;
5. nature of the educational program housed; and
6. racial/ethnic balance.[15]

8. Different civil organizations have studied the *problem of minority isolation* in the Rockford School District and have made varying proposals to the School Board. For example, the PTA proposed the use of such techniques as school closing; reassignment of a school as a Special Education Center; reassignment of a school as a Designated Emphasis School; school pairing and open enrollment.[16] The report of the Central Committee on Desegregation most significantly urged reassignment of students to meet a goal of 7 to 21 percent minority enrollment in all schools by the end of the 1974–75 school year.[17]

The plaintiffs, in support of their instant petition for a temporary injunction, contend:

1. Since the institution of this suit in 1970, the defendant has been promising to comply with U.S. law on equal quality education oppor-

tunities but while some changes have been made, there has continued to be irreparable harm to thousands of students in School District # 205.

2. The plan of the defendant, adopted on April 30, 1973, does not comply with the "Rules Establishing Requirements and Procedures for the Elimination and Prevention of Racial Segregation" issued by Dr. Michael J. Bakalis, Superintendent of Public Instruction for the State of Illinois, on November 22, 1971.

3. The violations of the principles of equal quality educational opportunities set forth in the *complaint of the instant action will not be complied with under the School Board's plan.*

The defendant, in opposition to the instant petition, contends that the plaintiffs have not properly alleged that the defendant has violated any of their constitutional rights and there is no federal jurisdiction to require, by use of a temporary or mandatory injunction, compliance by this defendant with the rules and regulations of the Superintendent of Public Instruction of the State of Illinois.

■ This Court having examined the pleadings, memoranda and exhibits submitted by the parties in support of their respective positions, and having heard and carefully weighed the testimony of numerous witnesses, is of the opinion that an injunction is not appropriate at this time. However, it is also the opinion of this Court that the present voluntary desegregation plan of the School Board is inadequate and thus the defendant should be given a period of time to work with the Office of the State Su-

---

14. See Plaintiffs' Exhibits 4, 5, and 6, and the testimony of witnesses concerning these exhibits in the hearing of July 2 and 3, 1973.

15. See Defendant's Exhibit 19. It appears to this Court that restructuring of attendance boundaries might well produce an alleviation of minority isolation in some of the non-complying schools.

16. See Defendant's Exhibit 20 and Defendant's Exhibit 12, Appendix A. See also the Citizen-at-Large Committee Proposal, Defendant's Exhibit 1.

17. See Appendix A to the Defendant's Exhibit 12.

perintendent of Public Instruction, the plaintiffs, and other concerned civic organizations in order to develop a more effective and practical program for desegregation.

■■ It is well settled that after a determination has been made that a current condition of segregated schooling exists within a school district, the state and the local school board automatically have an affirmative duty to effectuate a transition to a racially non-discriminatory school system. Keyes et al. v. School District # 1, Denver, Colorado et al., 413 U.S. 189, 93 S.Ct. 2686, 37 L. Ed.2d 548 (decided June 21, 1973); Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). At this stage in the proceedings, this Court has not yet determined that School District # 205 is *de facto* racially segregated. However, much of the evidence which has been presented to this Court to date strongly suggests a problem of minority isolation in the Rockford School District. It is therefore important that the School Board of School District # 205 be aware of its affirmative duty to comply with the dictates of the United States Constitution and the State of Illinois school desegregation policy.[18]

■ Where residential segregation is reflected in school enrollment figures, school officials have the burden of showing that there are no educationally sound and administratively feasible alternatives to overcome the existence of segregated schools. United States v. School District # 151, 404 F.2d 1125 (7th Cir. 1969).

■ Where school officials, in locating new schools and constructing additions to old schools, have failed to adjust school enrollments to fit school capacities in such a way as to lessen racial segregation, they have the affirmative duty to seek means of eradicating the results of their discriminatory acts. United States v. Board of Public Instruction of Polk County, Florida, 395 F.2d 66 (5th Cir. 1968); Lee v. Macon County Board of Education, 267 F.Supp. 458 (M.D.Ala.1967).

■ Teachers and other professional staff members may not be discriminatorily hired, assigned, dismissed, or demoted, because of race or color. Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); Rogers v. Paul, 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265 (1965); Bradley v. School Board of City of Richmond, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965); Stell v. Board of Education for the City of Savannah, 387 F.2d 486 (5th Cir. 1967).

State laws and/or administrative policies, directed toward the reduction and eventual elimination of *de facto* segregation and racial imbalance in schools have been approved by state courts. See e. g., Pennsylvania Human Relations Comm. v. Chester School District, 427 Pa. 157, 233 A.2d 290 (1967); Booker v. Board of Education of Plainfield, 45 N. J. 161, 212 A.2d 1 (1965); Addabbo v. Donovan, 16 N.Y.2d 619, 261 N.Y.S.2d 68, 209 N.E.2d 112 (1965), cert. denied, 382 U.S. 905, 86 S.Ct. 241, 15 L.Ed.2d 158; Vetere v. Allen, 15 N.Y.2d 259, 258 N.Y.S.2d 77, 206 N.E.2d 174 (1965); Guida v. Board of Education of the City of New Haven, 26 Conn.Sup. 121, 213 A.2d 843 (1965).

Federal courts have similarly approved the use by local school authorities of programs designed to alleviate *de*

18. The local School Board has expressed some doubt as to this Court's jurisdiction over the instant action. While the instant ruling of this Court is directed at trying to obtain an amicable local resolution of the instant controversy, there should be no doubt as to this Court's potency. See Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), and Keyes v. School District #1, Denver, Colorado, *supra.* Further, this Court's ruling is predicated on the sincerity expressed by the members of the School Board for resolving the instant problem of minority isolation in its schools. Affirmative and effective action by the School Board will obviate any need for detailed judicial action.

*facto* segregation and racial imbalance in the schools. Offerman v. Nitkowski, 378 F.2d 22 (2nd Cir. 1967); Deal v. Cincinnati Board of Education, 369 F.2d 55 (6th Cir. 1966), cert. denied, 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114; Wanner v. County School Board of Arlington County, 357 F.2d 452, 4 Cir.; Springfield School Committee v. Barksdale, 348 F.2d 261 (1st Cir. 1965); Hobson v. Hansen, 269 F.Supp. 401 (D.D.C.1967).

The problem with minority isolation at even one school is that it infects all schools. To put it simply, in a system which has two schools all blacks at one school means all or almost all whites at the other. See United States v. Texas Education Agency, 467 F.2d 848 (5th Cir. 1972). Both sides are in agreement that there is a problem of minority isolation in the Rockford School District. The point of controversy between the parties is what method should be used to achieve a more racially balanced school system.

After hearing and examining the testimony given by various witnesses, this Court is impressed by the School Board's sincere concern and good will in attempting to solve the instant problem. However, this Court is not thoroughly impressed by the School Board's plan for voluntary desegregation. It appears to this Court after examining all relevant data presented by the parties in support of their respective positions, that the voluntary desegregation plan adopted by the School Board on April 30, 1973 is not practical and will not effectively solve the instant controversy.

Testimony at the hearing held by this Court on July 2 and 3, 1973 clearly demonstrated that there is very little enthusiasm over the open enrollment program, and the School Board's projections of enrollment for the school year of 1973–74 demonstrate little, if any, change in minority isolation.[19]

From the facts set forth above there appears to be problems of underachiev-ers, a high number of drop-outs, poor facilities and supplies in certain schools in the Rockford School District. These problems might very well be related and to some extent caused by minority isolation. The present School Board's voluntary desegregation plan and its other programs do not seem to be adequately meeting and solving these problems. Further, School District # 205 presently fails to comply with the state standards relating to minority integration.

The Office of the Superintendent of Public Instruction for the State of Illinois has represented that it is willing to work with the School Board of School District # 205 to develop a plan which would solve the problem of minority isolation and enable the School District to comply with state standards on integration. The School Board has expressed a willingness to attempt to develop a program that will comply with the state standards and solve its problem of minority isolation. Thus, it is the opinion of this Court that at this time it would not be appropriate for the Court to become an activist and formulate a program of integration for the School District. It appears to this Court that the wiser course of action lies in permitting the School Board, aided by the State Department of Public Instruction and various civic organizations, to formulate and implement an acceptable program which would practically and efficiently eliminate minority isolation and its ill effects.

Accordingly, it is hereby ordered that:

1.  the plaintiffs' petition for a temporary injunction is denied at this time;

2.  the School Board is given until the first of February, 1974 to present an acceptable program that will eliminate minority isolation in its schools; and

3.  if the defendant School Board fails to develop an acceptable program

19. See Table 1.

by February 1, 1974, this Court will reconsider its ruling on the instant petition for a temporary injunction.