In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3200

People Who Care, et al.,

Plaintiffs-Appellees,

v.

Rockford Board of Education,
School District No. 205,

Defendant-Appellant.

Appeal from the United States District Court
for the
Northern District of Illinois, Western
Division.
No. 89 C 20168--P. Michael Mahoney, Magistrate
Judge.

Argued March 27, 2001--Decided April 18, 2001

Before Bauer, Posner, and Kanne, Circuit
Judges.

Posner, Circuit Judge.  Twelve years ago
the plaintiffs filed this suit against
the board of education of Rockford,
Illinois, charging that the board had
intentionally discriminated against black
and Hispanic students. Though nominally a
new suit, it was actually a continuation
of school desegregation litigation that
had started long before and had resulted
in the entry of a remedial decree as
early as 1973. See Quality Education for
All Children, Inc. v. School Board, 362
F. Supp. 985 (N.D. Ill. 1973).
Realistically, we are dealing with a
lawsuit that is almost 30 years old.

In 1994, the district judge found, by
inference from disparities in educational
achievement between white and minority
students and from the school board's
failure to take effective measures to
prevent individual public schools from
becoming all white or all minority, that
the board had indeed engaged in

intentional racial discrimination. 851 F. Supp. 905 (N.D. Ill. 1994). The board did not appeal, and so the litigation moved into the remedial stage, presided over by a magistrate judge with the consent of the parties. A formidably complex and ambitious remedial decree was entered in 1996, provoking appeals that led us the following year to vacate many of its provisions, such as racial quotas for cheerleaders, superseniority for minority teachers, unrealistic goals for closing the white-minority gap in test scores, and limits on the number of minority stu dents who could enroll in remedial classes. 111 F.3d 528 (7th Cir. 1997). We pointedly warned against "ambitious schemes of social engineering" and stated that children "should not be made subjects of utopian projects." Id. at 534. Apart from misdescribing our opinion as having merely "modified" certain provisions of the decree, the magistrate judge managed to avoid any reference to that opinion in his latest, 57-page opinion here under review.

Later we remarked "the failure of the parties, and, it seems, the magistrate judge and the special master who is assisting him, to heed the admonition of the Supreme Court, see Missouri v. Jenkins, 515 U.S. 70, 99 (1995); Board of Education v. Dowell, 498 U.S. 237, 248 (1991), which we have repeated, United States v. Board of School Commissioners, 128 F.3d 507, 510 (7th Cir. 1997), to bend every effort to winding up school litigation and returning the operation of the schools to the local school authorities." 153 F.3d 834 (7th Cir. 1998) (per curiam). And the following year, in still another opinion, we warned of "the looming interminability of this litigation," and noting the school board's representation that full compliance with the decree was achievable by 2002 we suggested that the board submit to the magistrate judge a plan for winding up the litigation. 171 F.3d 1083, 1090-91 (7th Cir. 1999). The board then moved the magistrate judge to dissolve the decree, effective June 30, 2002, the end of the 2001 school year. The board argued that it had achieved full compliance with the decree's objectives and that the remaining inequalities in educational achievement between white and minority students could not be attributed to the illegal conduct on which the

litigation was based. (Why the board asked for deferred rather than immediate dissolution is unclear, but we are not disposed to give it more relief than it asked for.) The magistrate judge agreed to relax some provisions of the decree, but ruled that others must continue for at least another six (now five) years. The plaintiffs would like the decree to continue in effect for at least 11 more years. We stress "at least." Nothing in the logic of either the magistrate judge's opinion or the plaintiffs' brief on appeal suggests any natural terminus to the decree.

Through the end of 1999 the taxpayers of Rockford had incurred total costs of $238 million to comply with the 1996 decree and its predecessors going back only to 1989, of which more than half had been incurred since 1996. By now the total must be substantially greater. Attorneys' fees alone are approaching $20 million. Twenty percent of the school district property taxes paid by homeowners in Rockford go to fund the decree. As a result of the improvements enabled by this large expenditure, and a policy of allowing parents to choose which Rockford public school to send their kids to, the school district had by the end of 1999, when the school board filed its motion to dissolve the decree, succeeded in desegregating its schools. Desegregation had been defined by the magistrate judge as the condition in which the minority composition of each school would not deviate by more than 15 percentage points from the minority composition of the population of the school district. Because this is a tighter range than imposed in most school desegregation cases, the Rockford public schools are now less segregated than those in any previous case in which a school system was declared "unitary" (that is, declared sufficiently desegregated to require the dissolution of the decree and the return of control of the public schools to the school board). The plaintiffs fear backsliding, and so want a wait-and-see period of at least 15 years after desegregation, during which the decree would remain in force.

The length of the litigation, the scale of the expenditures, and the achievement of desegregation constitute, against the background of applicable law, compelling

arguments to end this litigation. It used to be extremely difficult to modify any kind of equitable decree. See United States v. Swift & Co., 286 U.S. 106 (1932). But as we noted recently in ordering radical modification of another institutional reform decree, one that had subjected the Chicago police to severe restrictions on its power to investigate terrorist activities, the Supreme Court has adopted a much more flexible standard for the modification of decrees entered in institutional reform litigation than the Swift standard of yore. Alliance to End Repression v. City of Chicago, 237 F.3d 799, 800-01 (7th Cir. 2001); see Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 378-81 (1992); Board of Education v. Dowell, supra, 498 U.S. at 248; see also Alexander v. Britt, 89 F.3d 194, 197-98 (4th Cir. 1996). The Court believes the states and their subdivisions have a right to the restoration of control over the institutions of state and local government as soon as the objectives of the federal remedial decree have been achieved. Missouri v. Jenkins, supra, 515 U.S. at 99; Bogard v. Wright, 159 F.3d 1060, 1065 (7th Cir. 1998); People Who Care v. Rockford Board of Education, 153 F.3d 834 (7th Cir. 1998) (per curiam); United States v. Board of School Commissioners, supra, 128 F.3d at 510. Unlike decrees that bind private parties, decrees that hand over the control of important state functions, such as education, to federal courts "are not intended to operate in perpetuity." Board of Education v. Dowell, supra, 498 U.S. at 248. "[T]he Supreme Court disfavors permanent injunctions in school cases. The administration of public schools is a state executive function rather than a federal judicial function, and so ought not to be subjected to the perpetual tutelage of the federal courts." United States v. Board of School Commissioners, supra, 128 F.3d at 510.

The purpose of a school desegration decree is to eliminate the consequences of segregation. When they have been eliminated the decree has done its job and should be lifted. This simple principle, which we don't understand the plaintiffs to be quarreling with, dictates our decision. The Rockford public schools have been desegregated. No longer are there any schools that are

"white only" or "minority only," or even approximations to such schools. Hundreds of millions of dollars have been poured into the construction and renovation of schools and into programs designed to extirpate the traces of unlawful segregation. Although minority educational achievement lags behind that of whites, there is no evidence that the lag is any greater in Rockford than in otherwise similar districts that have no history of racial discrimination.

Four years ago almost to the day we noted the absence of "evidence that the gap in scholastic achievement between white and minority students in Rockford is any greater than the gap between white and minority students in school districts that have not been found to have discriminated against their black and Hispanic students." 111 F.3d at 537. One might have expected the plaintiffs to take the hint and look for such evidence. If they have looked, they have found nothing. Although peppered with references to programs designed to achieve "vestige elimination," the plaintiffs' brief cites no evidence that there are vestiges of unlawful discrimination still to eliminate. "At some point," moreover, "the continuing and ineliminable traces of an earlier violation are too slight to justify continued federal judicial control of public education." United States v. Board of School Commissioners, supra, 128 F.3d at 511.

The reality is that until minority students achieve parity of educational achievement with the white students in the Rockford public schools, the plaintiffs will contend that the minority students are victims of the unlawful discrimination of an earlier period in Rockford's history. Yet it is obvious that other factors besides discrimination contribute to unequal educational attainment, such as poverty, parents' education and employment, family size, parental attitudes and behavior, prenatal, neonatal, and child health care, peer-group pressures, and ethnic culture. Some of these factors may themselves be due to or exacerbated by discrimination, but not to discrimination by the Rockford school board. The board has no legal duty to remove those vestiges of societal discrimination for

which it is not responsible. Insofar as the factors that we have mentioned, rather than unlawful conduct by the Rockford school board in years past, are responsible for lags in educational achievement by minority students, the board has no duty that a federal court can enforce to help those students catch up. It may have a moral duty; it has no federal constitutional duty.

No effort has been made by the plaintiffs, despite our warnings, to partition, however crudely, the lag in achievement that is due to the school board's past illegalities and the lag that is due to other factors, factors for which the school board bears no federal legal responsibility. The partition could be made by comparing minority academic performance in Rockford with the performance of minority students in other school districts after adjusting for the various factors that are not the school board's legal responsibility yet might be thought to influence the academic performance of Rockford's minority students, such as poverty, family stability, health, class size, and quality of teachers. There are statistical methods for holding these factors constant in order to isolate the influence, if any, of the board's illegal conduct on the academic performance of Rockford's minority students. No such scientific comparison has been attempted--nor even anything cruder.

The plaintiffs' failure to recognize the importance of trying to unpack the causes of disparate educational performance is illustrated by their contention that although the Rockford schools may now be desegregated, the classrooms within those schools remain segregated and until they are desegregrated the decree must remain in force. What they mean by the classrooms still being segregated is that minority students are underrepresented in advanced courses. Yet enrollment in those courses is open. No one is being kept out. (If enrollment were not open but instead were rationed by test scores, a much smaller percentage of minority students would be enrolled in the advanced classes, the magistrate judge found--6 percent rather than 23 percent.) To suppose that minority students are enrolling in these classes at a lower rate than white students because of

school segregation in the past is illogical, or at least unsubstantiated. The schools are desegregated, the advanced courses are open to any student, and if fewer minority students are enrolling than their proportion in the school or school district as a whole, the natural inference is not that the proportion is being held down by the fact that years ago the schools were segregated. That is conceivable, but so improbable that evidence is required to use the fact as a basis for continuing a federal judicial officer in control of the public school system. The plaintiffs' case is an extreme version of post hoc ergo propter hoc. It is provincial and naive to suppose that because Rockford once engaged in de facto segregation of its public schools, the choices of its minority students regarding voluntary enrollment in advanced classes open to all are a legacy of that segregation.

The plaintiffs' principal argument for the indefinite continuation of the decree is that the school board has not been complying with it in good faith. The difference between technical compliance and compliance in good faith is that the latter form of compliance does not exploit loopholes and ambiguities. Philips Medical Systems Int'l B.V. v. Bruetman, 8 F.3d 600, 604 (7th Cir. 1993); United States v. Board of Education, 799 F.2d 281, 289-90, 295 (7th Cir. 1986); Manning v. School Board, No. 99-2049, 2001 WL 264977, at *16 (11th Cir. March 16, 2001). It is not, as the plaintiffs would have it, that the school board must "actively" support the decree, must express "commitment" to it, and, above all, must not criticize it. The undemocratic implications of this position leave us almost speechless. Are elected officials, the members of the school board, elected long after and not complicit in the illegalities that gave rise to the litigation, forbidden, under threat of never resuming control of the public school system that they were elected to govern, to criticize a decree that in pursuit of an ambitious and possibly quixotic scheme of social engineering has imposed a formidable tax burden on the people who elected these officials?

Pressed at argument, the plaintiffs' able lawyer could not cite an instance in

which the school board has violated any of the numerous provisions of the decree. He may well be correct that the decree would have achieved more had it been enthusiastically embraced by the board, but state and local officials are under no duty to love the chains that federal judges, however justifiably, fasten upon them.

The judgment is reversed with instructions to grant the relief requested by the school board. It should go without saying that if the board takes advantage of its new freedom from federal judicial control to discriminate against minority students in violation of federal law, it will expose itself to a new and draconian round of litigation. We trust that $238 million later, it has learned its lesson.

Reversed and Remanded, with Instructions.