**QUALITY EDUCATION FOR ALL CHILDREN, INC., et al., Plaintiffs,**

v.

**SCHOOL BOARD OF SCHOOL DISTRICT #205 OF WINNEBAGO COUNTY, ILLINOIS, Defendant.**

**No. 70 C 16.**

United States District Court,
N. D. Illinois, W. D.

June 27, 1974.

Donald S. Frey, Evanston, Ill., for plaintiffs.

Dale F. Conde, Pedderson, Menzimer, Conde, Stoner, Ferolie & Spelman, Rockford, Ill., for defendant School Board.

Anthony R. Fabiano, Rockford, Ill., for defendant-intervenor REA.

Rolland J. McFarland, Rockford, Ill. and James C. Murray, Richard M. Calkins, Burditt & Calkins, Chicago, Ill., for defendant-intervenor Parents.

## MEMORANDUM OPINION AND ORDER

BAUER, District Judge.

This cause comes on the submission by the respective parties of their various proposals for school desegregation.

The named plaintiffs are all citizens of the United States and residents of School District #205 of Winnebago County, Illinois. Some of the named plaintiffs are individuals while others are community organizations which are allegedly voluntary associations of citizens, most of whom are also citizens of the school district and taxpayers of the State of Illinois. The defendant is the School Board of School District #205 of the Winnebago County Schools, State of Illinois.

On January 4, 1974 this Court allowed the parents of certain school children attending school in School District #205 to intervene in these proceedings as self

styled defendant-intervenors. On February 15, 1974, the Rockford Education Association, Inc. ("REA"), which is the teachers' union for the school district, was allowed to intervene in this litigation as a defendant.

The instant suit is a class action, brought by the plaintiffs (qua individual taxpayers and voluntary associations) on behalf of other residents and taxpayers similarly situated in School District #205 of Winnebago County, State of Illinois ("School District"), pursuant to Rule 23(a) and Rule 23(b)(2), Federal Rules of Civil Procedure. The class represented by the named plaintiffs allegedly consists of all residents of the School District including both black and white citizens.[1]

The instant suit seeks to redress the alleged deprivation of the plaintiffs' civil rights by the alleged racial discrimination and imbalanced educational opportunities existing in the defendant School District in violation of the Tenth, Thirteenth, Fourteenth and Fifteenth Amendments to the United States Constitution. See Quality Education for All Children, Inc. et al. v. School Board of School District #205 of Winnebago County, Illinois, 362 F.Supp. 985 (N.D. Ill.1973). This Court allegedly has jurisdiction over the instant action pursuant to 42 U.S.C. § 1981.

This Court in its *Memorandum Opinion and Order* dated August 16, 1973 clearly explicated the relevant facts which strongly suggest a problem of minority isolation in the School District. See Quality Education for All Children, Inc. et al. v. School Board of School District #205 of Winnebago County, Illinois, supra. It was clear that the School District failed to comply with state standards relating to minority integration.[2] This Court's *Memorandum Opinion and Order* dated August 16, 1973 contains, *inter alia,* the following facts which are important to the proper evaluation of any school desegregation program:

1. *Minority Isolation.*

Minority enrollment in the School District is approximately 15% (6,233 out of 41,364 students). In the school year of 1971–72, there were a total of 5,362 minority students in the School District and 2,386 (44.4%) of those minority students were attending schools in which minority attendance exceeded 50% of the enrollment. From figures submitted by the School Board it was projected that these statistics would increase in the school year 1973–74 to 6,233 minority students, 2,758 (44.2%) in schools which have 50% or more minority attendance[3] enrollment.[4] Table 1, from the Order of August 16, 1973,

---

1. There has been no determination to date as to whether the instant action can be maintained as a class action. The plaintiffs allege: (1) that the purported class is so numerous that joinder of all members is impractical; (2) that there are questions of law and fact common to the class; (3) that claims of the representative plaintiffs are typical of the claims of the class; (4) that the representative plaintiffs will fairly and adequately protect the interests of the class; and (5) that the parties defendant have acted or refused to act on grounds generally applicable to plaintiffs as a class.

2. The defendant School District statistically fails to meet the standards set by the "Rules Establishing Requirements and Procedures for the Elimination and Prevention

of Racial Segregation in Schools" issued on November 22, 1971 by Michael J. Bakalis, Superintendent of Public Instruction, State of Illinois. The plaintiffs allege that the defendant School Board has received a statement of non-compliance from the Illinois Superintendent of Public Instruction and has not complied with the said notice, as required by the directive, to achieve quality integrated education in Rockford free of alleged segregated educational practices.

3. These statistics are based on an analysis of the data contained in Defendant's Exhibit 12 submitted at the Hearing on July 2–3, 1973.

4. In the Hearing held on April 3, 1974, the School Board represented that minority enrollment presently is approximately 16.1% (6,521 out of 40,521).

summarizes these statistics in non-complying schools for the year 1972–73 and the projection for the following school year.[5]

TABLE 1

MINORITY ENROLLMENT IN NON-COMPLYING SCHOOLS

| School | School Year 1972–73 | | | School Year 1973–74 | | |
|---|---|---|---|---|---|---|
| | Total enroll-ment | No. of minority students | % of mi-nority en-rollment | Total enroll-ment | No. of minority students | % of mi-nority en-rollment |
| Barbour | 431 | 317 | 73.5 | 431 | 317 | 73.5 |
| Beyer | 355 | 137 | 38.5 | 355 | 137 | 38.5 |
| Dennis | 400 | 370 | 92.5 | 400 | 370 | 92.5 |
| Ellis | 435 | 343 | 78.8 | 408 | 316 | 77.4 |
| Haskell | 432 | 285 | 65.9 | 432 | 284 | 65.7 |
| Henrietta | 178 | 136 | 76.4 | 178 | 132 | 74.1 |
| Lathrop | 305 | 219 | 71.8 | 305 | 319 | 71.8 |
| Lincoln Pk. | 532 | 299 | 56.2 | 532 | 299 | 56.2 |
| McIntosh | 459 | 171 | 37.2 | 459 | 171 | 37.2 |
| Muldoon (to be closed '73–'74) | 290 | 226 | 77.9 | 290 | 226 | 77.9 |
| Rock River | 456 | 195 | 42.7 | 456 | 195 | 42.7 |
| Washington | 579 | 350 | 60.4 | 579 | 350 | 60.4 |
| Wilson | 1236 | 610 | 49.3 | 1236 | 509 | 49.2 |

2. *High Minority Enrollment Correlated to High Minority Underachievement.*

Many witnesses who testified for the plaintiffs at the Hearing on July 2–3, 1973, expressed the opinion that schools with high minority enrollment have high minority underachievement.[6] Certain statistics seem to indicate higher underachievement among minority stu-

5. The School Board has projected that in the school year 1973–74 there would be 6,233 minority students out of 41,364 total student enrollment or 15.0% (Defendant's Exhibit 12, page 1). According to the State Superintendent's standards, minority enrollment of a school in School District #205 can range from 0% to 30%. The statistics in this table come from an analysis of data contained in Defendant's Exhibit 12, pages 9 through 15.

6. The School Board, in its application for assistance under the Emergency School Aid Act, submitted December 20, 1973, related the following statistics concerning underachievers in non-complying schools (page 300–1):

| School | Grades | Enroll-ment | Under-Achievers |
|---|---|---|---|
| Barbour | K–5 | 425 | 199 |
| Beyer | K–6 | 358 | 137 |
| Church | 1–5 | 328 | 108 |
| Dennis | K–4 | 361 | 197 |
| Ellis | K–3 | 393 | 139 |
| Haskell | K–4 | 359 | 219 |
| Kishwaukee | K–6 | 477 | 250 |
| Lathrop | K–5 | 291 | 72 |
| Lincoln Park | K–6 | 546 | 298 |
| McIntosh | 1–5 | 435 | 60 |
| Muldoon | 4–5 | 256 | 110 |
| Rock River | K–6 | 438 | 236 |
| | TOTAL | 4667 | 2025 |

Thus 43% of those enrolled in non-complying schools are functioning below their respective grade levels.

dents in schools cited for non-compliance with Illinois State Standards, as Table 3 from the Order of August 16, 1973 demonstrates: [7]

TABLE 3

MEAN SCORES OF 5th GRADE STUDENTS
(for percentages of minority enrollment see Table 1)

| SCHOOL | Minority | | Non-Minority | | All Students | |
|---|---|---|---|---|---|---|
| | Reading | Math | Reading | Math | Reading | Math |
| Barbour | 36.77 | 34.89 | 46.30 | 40.76 | 38.80 | 36.14 |
| Beyer | 30.63 | 44.05 | 36.88 | 44.60 | 34.18 | 44.30 |
| Dennis | ..... | ..... | .... NO 5th GRADE .... | | ..... | ..... |
| Ellis | ..... | ..... | .... NO 5th GRADE .... | | ..... | ..... |
| Haskell | 31.67 | 31.92 | 38.54 | 35.63 | 34.70 | 33.56 |
| Henrietta | ..... | ..... | .... NO 5th GRADE .... | | ..... | ..... |
| Lathrop | 45.14 | 47.00 | 47.08 | 46.16 | 45.63 | 46.63 |
| Lincoln Pk. | 28.87 | 29.24 | 42.12 | 37.47 | 33.36 | 32.03 |
| McIntosh | 30.44 | 27.27 | 41.31 | 36.95 | 35.76 | 32.01 |
| Muldoon | 29.21 | 29.61 | 40.11 | 28.92 | 31.39 | 29.47 |
| Rock River | 32.30 | 36.19 | 41.69 | 35.05 | 37.75 | 35.57 |
| MEAN SCORES OF 7th GRADE STUDENTS | | | | | | |
| Washington | 31.94 | 33.92 | 38.76 | 39.59 | 35.20 | 36.64 |
| Wilson | 27.68 | 34.59 | 38.88 | 42.57 | 33.83 | 38.97 |
| All City | 29.63 | 34.30 | 49.94 | 53.27 | 47.52 | 51.01 |

———◆———

Additional data deems to reveal that schools with higher minority enrollment also have higher drop-out rates. For example, Auburn and West, which had respectively 30% and 15.7% minority enrollment in 1972–73, had a considerably higher drop-out rate over the year than Gilford, which had only .9% minority enrollment. It should be noted that high schools in School District #205 have considerably less minority isolation than the elementary or middle schools. Table 4 from the Order of August 16, 1974, clearly demonstrates this:

TABLE 4

DROP-OUT RATE IN SCHOOL
DISTRICT #205 FOR GRADES 9–12

| School | Percent of minority enrollment 1972–73 | Percentage of drop-outs to the total enrollment | | |
|---|---|---|---|---|
| | | 1970–71 | 1971–72 | 1972–73 |
| Auburn | 30.7 | 11.0 (227) | 12.5 (252) | 12.1 (237) |
| East | 10.4 | 8.0 (192) | 7.4 (186) | 7.2 (195) |
| Gilford | .9 | 4.0 (110) | 2.6 (68) | 2.2 (55) |
| Jefferson | 7.0 | 8.0 (167) | 10.9 (258) | 10.9 (247) |
| West | 15.7 | 7.0 (164) | 9.2 (205) | 9.9 (946) |

———◆———

7. See Defendant's Exhibit 12, submitted at the July 2–3, 1973, hearing, pages 72–95. These statements are compiled from Metropolitan Achievement tests which were administered in grades 5 and 7 during October and November, 1972.

Although some witnesses testified that many of the drop-outs were members of a minority, no data has been submitted to this Court concerning the percentage of drop-outs who were members of a minority. Thus, the roll that minority isolation plays in drop-outs cannot be adequately assessed at this time.

3. *Attendance Boundaries Drawn So As to Foster Minority Isolation.*

The data does show a problem with minority isolation, at least insofar as the schools which were cited by Dr. Bakalis for non-compliance with state standards. The School Board has stated that six factors entered into drawing of school attendance boundaries:

1. Educational needs of students.

2. Proximity to school.

3. Safety of students.

4. Ages of students served.

5. Nature of educational program housed.

6. Racial/ethnic balance.

The report of the Central Committee on Desegregation most significantly urged reassignment of students to meet a goal of 7 to 21 percent minority enrollment in all schools by the end of the 1974–75 school year. The School Board's most recent plan, submitted on April 1, 1974 at least attempts to solve this problem on the middle and high school level.

4. *A Low Number of Minority Teachers.*

School District #205 in school year 1972–73 had 1,679 school teachers. Approximately 100 or 5.95% of

these teachers are members of a minority; further, 4.74% of all high school teachers are members of a minority; 7.55% of all middle school teachers are members of a minority; and 5.63% of all elementary school teachers are minority teachers. The School Board has a five year program to increase minority staff members and from all statements made the program is moving forward at a good pace (see this Court's *Memorandum Opinion and Order* dated August 16, 1973, pages 15–19.[8]

5. *School Facilities and High Minority Schools.*

The members of the American Association of University Women and the League of Voters completed a survey of elementary school needs. This survey concluded, *inter alia,* that the southeast quadrant of the city (an area of high minority enrollment) has schools that suffer from a lack of materials and up-to-date texts; that buildings in the southeast section are somewhat crowded and special purpose rooms are lacking.[9]

On January 4, 1974, pursuant to the mandate of this Courts' *Memorandum Opinion and Order* dated August 16, 1973, the School Board submitted its Grade Exchange Plan for school desegregation.[10] On March 1, 1974 this Court refused to approve this plan and ordered that there should be a more extensive factual and statistical analysis by the parties of the proposed plan and an exploration by the parties of other alternative measures which would not necessarily involve forced busing of school

8. The School Board's good will in carrying out this program can be demonstrated by the fact that as of June 25, 1973 the School Board has either sent letters of intent or has hired 48 people of whom 14 or 29% are members of a minority.

9. See Defendant's Exhibit 2 (the *Direct Line Supplement,* dated November 28, 1972) submitted to this Court at the Hearing on July 2–3, 1973.

10. On February 4, 1974, the defendant-intervenors filed their comments in opposition to the Grade Exchange Plan. Then the plaintiffs filed their comments in opposition to that plan. On February 20, 1974, the REA filed its objections to the Grade Exchange Plan. On February 28, 1974, School District #205 filed its responses in support of the Grade Exchange Plan and in opposition to the memoranda filed by the other parties.

children or such an extensive use of busing.

In the Order dated March 1, 1974, this Court articulated the following five principles which are helpful in evaluating the present school desegregation plans submitted by the parties:

1. While bus transportation has been an integral part of the public education system for years, and was perhaps the single most important factor in the transition from the one-room schoolhouse to the consolidated school, "busing" should be reluctantly used to solve the problem of school segregation. Such "busing" poses numerous problems and inconveniences on parents, students and school officials. Thus the busing of school students in order to solve school segregation should only be utilized when all other remedial measures appear impractical and ineffective.

2. One of the principal tools employed by school planners and by courts to break up a segregated school system has been a frank and sometimes drastic gerrymandering of school districts and attendance zones. An additional step has been pairing, "clustering" or "grouping" of schools with attendance assignments made deliberately to accomplish the transfer of minority students out of formerly segregated schools and the transfer of white students to formerly minority schools. While the School Board's Grade Exchange Plan does utilize a modification of this "clustering" principle, it fails, with one exception, to make use of the remedial measure of altering the School District's attendance zones. A "racially neutral" assignment plan may fail to counteract the continuing effects of past school segregation resulting from discriminatory location of school sites or distortion of school size in order to achieve or maintain an artificial racial separation. When school authori-

ties present a "loaded game board", affirmative action in the form of remedial altering of attendance zones is proper to achieve truly non-discriminatory assignments. In short, an assignment plan is not acceptable simply because it appears to be neutral; it must also affirmatively enhance racial integration.

3. The use of mathematical ratios is no more than a starting point in the process of shaping a remedy, rather than an inflexible requirement. From that starting point the School Board can proceed to frame a solution to its particular problem of racial segregation. Awareness of the racial composition of the whole school system is likely to be a useful starting point in shaping a remedy to correct past constitutional violation. The mere balancing of mathematical ratios does not assure that the dilatory effects of racial segregation have been cured.

4. A school desegregation plan which solely utilizes a grade exchange program is probably incapable of truly desegregating a school system or a single school. Such a plan in reality creates segregated classrooms within a school which is "desegregated" as far as mathematical ratios.

5. All things being equal, it might well be desirable to assign pupils to schools nearest their homes. But all things are not equal in a system that has been deliberately constructed and maintained to enforce racial segregation. The remedy for such segregation may be administratively awkward, inconvenient, and even bizarre in some situations. Burdens may be imposed on some. But all awkwardness and inconvenience cannot be avoided during the interim period of change when remedial adjustments are being made to eliminate a segregated school system. For the greater good all must be willing to sacrifice a transitory inconvenience.

Pursuant to this Court's Order dated March 1, 1974, the defendant School Board, the plaintiffs, intervening defendants, as well as representatives of the community had many meetings and discussions to attempt to work out a general agreement on desegregation in the School District.

On April 1, 1974 the School Board filed "A Report To The Rockford Board of Education on Desegregation Proposals." This report states that there is general agreement between the parties on the following matters:

"1. Any desegregation program for the Rockford Public Schools should concern itself with improving educational opportunities for ALL children.

2. An integrated school system is a desirable objective.

3. The neighborhood school concept should be retained as far as possible.

4. There is a reluctance to resort to forced transportation of pupils simply to reduce the statistics of racial isolation.

5. It is desirable for any desegregation plan to fit the limitations of the school budget.

6. In-service training for teachers is an essential factor in making any desegregation program workable.

7. Voluntary participation on the part of the public should be encouraged, and be an important part in any desegregation program.

8. Steps should be taken to provide a continuing program to maintain the effectiveness of any desegregation plan. Citizens should play a key role in this procedure. ·

9. Special interest centers and alternative schools can be an important ingredient of the district's desegregation proposal.

10. Efforts should be made to keep the public informed about the development of new programs, special interest centers and alternative schools. This type of information may promote greater participation in these programs."

■ On April 3, 1974 this Court held a hearing in this matter and all parties present had an opportunity to present their proposed school desegregation plan and to comment on plans proposed by the other parties. The parties have been given ample opportunity after this hearing to file written material in support of their plan or comments on the proposed plans of the other parties. The obligation of this Court, as it always has been, is to help assess the effectiveness of the proposed plans in achieving desegregation. There is no universal answer to the complex problems of desegregation. There is obviously no one plan that will do the job in every case. The instant proposed plans must be assessed in light of the prevailing conditions and structure of the Rockford School System and the available options which are feasible and practical under these circumstances.

## I.  THE SCHOOL BOARD'S PLAN FOR DESEGREGATION.[11]

### A.  *The Plan.*

#### 1.  *Elementary Schools.*

a.  Maintain the present open enrollment policy for alternative schools, as well as the entire district.[12]

11. On April 29, 1974 the Board of Education passed a resolution which in essence reaffirms all of the desegregation guidelines and programs presented to this Court on April 3, 1974 and makes one amendment thereto, namely, that any parent or guardian of a student would have the right to withdraw the student from the desegregation program. The request for withdrawal must be in writing and provided to the administration of the

School District under such terms and conditions as shall be passed by the Board of Education. The terms and conditions involved would be setting dates and deadlines by which the written notice must be made and providing forms for such written notice of withdrawal.

12. The School Board plans to implement these programs by developng a brochure listing the various alternatives and special

b. Encourage voluntary transfers where space is available and such transfers contribute to integration of the district.

c. (1) Establish special interests in: [13]

(a) Reading-Language Arts; [14]

(b) Science and Mathematics;

(c) Social Studies;

(d) Environmental Education;

(e) Health & Safety; and

(f) Living Arts (music, dance, drama, etc.).

(2) Students in grades 3 through 6 shall be transported from their regular schools to three integrated special interest centers of their choice, for a total of 15 days during the school year. These centers would provide facilities for both advanced and remedial study.[15] The sessions would consist of five consecutive days each and would be scheduled three times during the school year.

(3) The programs would be so designed that limited multi-age grouping could occur and curriculum material would be handled in a unit approach. While major emphasis would be placed on the center's core curriculum content, other related learning activities would be used to enrich or remediate as the need arose.[16]

d. Retain the present alternative schools and establish additional al-

interest programs available to pupils enrolled in the Rockford Public Schools. This brochure would provide parents with a wealth of information about disciplinary procedures, names and addresses of Board members and an organizational chart of administrative personnel. The primary function of such a brochure would be to outline the educational options for pupils. Parents would be able to refer to such a document to determine the objectives of the special interest centers and alternative schools, and to familiarize themselves with some of the important educational innovations already taking place in many of the schools throughout the district. The role of the target schools would be explained and the objectives and locations of magnet schools would be listed. Development of the brochure could play a key role in stimulating the interest of pupils and parents and in encouraging greater participation in the varied educational opportunities open to residents of the School District.

13. The School Board has represented that all parties involved have recommended that special education pupils be exempted from participating in desegregation programs for the reasons that have already been listed. Assignments for attendance at the special interest centers would be coordinated by the Director of Integration to ensure an integrated setting.

14. A more specific example of how the Reading-Language Arts Center would function is as follows:
A. Examples of units that might be taught are:
1. writing a newspaper;
2. literature study (Great Books);
3. creative writing;
4. the Library and Learning Center;
5. bookmaking;
6. creative drama.
B. Inherent in the above units would be development of the following skills:
1. penmanship and typing skills;
2. functional writing skills;
3. oral expression and communication;
4. listening skills;
5. critical reading skills;
6. research techniques.

15. The School Board stated that the importance of the other centers is almost self-evident when one considers the need for encouraging maximum pupil growth in the vital areas of language, science and mathematics. "We live in a world of science and if we are to control our destiny, we will need to understand that world. At the same time, man is more than a product of his technology and the living arts and social studies programs can help youngsters to make intelligent choices about needs and priorities for their futures."

16. The School Board has represented that it would be important that teachers be trained to use the special interest centers effectively so that students at the centers are helped to develop their potential. This will require in-service training sessions. These sessions can be planned and coordinated by the Director of Elementary Education and the Director of Research and Development working with the Assistant Superintendent in charge of Instruction. The curriculum would be developed by the staff and administration.

ternatives to reflect parent interest and staff abilities.[17]

e. Retain the Target Schools to improve educational opportunities in areas with a prior history of low achievement.

f. Establish magnet schools in future years.

g. Exempt special education personnel and pupils from the parameters of any desegregation plan since these youngsters require special facilities and equipment and are already being integrated into regular classrooms wherever possible.

h. The Cost Factor—Opening the special interest centers would probably require between 15 and 25 additional staff members. Some of the possible sites are schools that have available space for these centers. Other buildings would require some renovation in order to be used. Transfer of pupils to the special interest centers, the voluntary transfers, the attendance of alternative schools are all financed by district funds under present Board policy. Shuttle transfer of students to the special interest centers would increase transportation costs. Basic equipment and texts for the centers should generally already be available.

2. *Middle Schools.*

a. Open enrollment to continue—Voluntary transfers are to be encouraged.

b. More effective utilization of present facilities—The Washington Middle School physical plant would be utilized more fully. More white youngsters would be assigned to Wilson School and the transfer of minority youngsters from that building to other buildings with a low percentage of minority enrollment would be encouraged. Also the southeast quadrant of the city would be provided with a middle school.

c. Possible development of special interest centers at the middle school level—This would allow the School District to further utilize the Area Vocational Centers.

d. Some boundary changes might be feasible and the School Board is studying this problem. Jefferson High School could revert to its middle school status in the future. This is a long-range plan that would provide for construction of a new and larger high school. Boundaries would be arranged so that both of these facilities would open with an integrated population. Morris Kennedy Middle School would be closed.

e. In-service teacher training under the same objectives as outlined for the elementary schools.

f. Continuation of the alternative middle school and possible future development of other alternatives if requested by parents and staff.

g. The Cost Factor—The cost of transportation of students under the voluntary enrollment policy depends on the numbers involved. An approximate cost has been developed per bus and could be applied to enrollment projections. Development of a new high school might cost as much as $5 million and could not be expected without a bond referendum. Actually, the School Board contends that construction of two new high school buildings could be justified on the basis of present high school enrollments. Without additional space, the extended day program remains a necessity for the high schools. Further, boundary changes might help alleviate racial impaction at some schools but the need for these changes would depend on voluntary enrollment patterns.

17. Discussions are now being held about a school that would emphasize the traditional 3 R's and discipline. The bilingual-and-bicultural program may be expanded.

3. *High Schools.*

a. Maintain the voluntary enrollment policy and encourage voluntary transfers.

b. Establish an alternative high school at the 9th grade level for 1975–1976.

c. Establish boundary changes as necessary if voluntary transfers fail to achieve desirable racial balances. These boundary changes would go into effect during the 1975–1976 school year for new enrollments only and would continue in effect until racial isolation is significantly reduced.

d. Construct a new high school as soon as possible after approval by a public referendum.

e. The overcrowding at East and Jefferson High Schools would be reduced. The majority student enrollment in Auburn and the minority student enrollment in Gilford would be increased.

f. The Cost Factor—The cost of transportation would depend on the number of youngsters choosing to participate in any of the above programs. There would be some cost in notifying parents of 7th graders this year as to which high school their child would attend if boundary changes are necessary. Construction of a new high school could cost at least $5 million, depending on the type of structure and equipment. The high school principals, the Assistant Superintendent, the Superintendent and the architect and business department would cooperate in the planning of such a facility. Parents and students would also be involved in working out educational specification for Board review.

4. *Parent Participation.*

a. Plans for Parent Input.

(1) Each school will have a Community Advisory Council of at least three people, one member to be the principal of the school. That committee will be charged with recording the racial enrollment of the school and the neighborhood and reporting changes to the Area Chairman of the Elementary Schools or the Middle or High School Chairman. These chairmen will report to the Director of Attendance. If a neighborhood pattern or enrollment pattern appears to be changing drastically, steps can be taken to enroll newcomers to a neighborhood at another nearby school when this will help maintain that neighborhood school's racial balance. It will be up to the neighborhood committee to make this initial recommendation and to keep other residents informed of such changes.

(2) Each family will receive a booklet describing the philosophy and special attributes of the interest centers, alternative schools, magnet schools and elementary school programs in their attendance area.

(3) The Advisory Council of each school will make recommendations to the Board about the desirable minority/majority percentage of enrollment.

(4) The Advisory Council of each school will work closely with the parent organization at each school to keep parents informed of its conclusions and recommendations.

(5) An area council of one member of each school's Advisory Council and parent organization should be established to meet at least once a year and become informed of new educational programs and issues. Reports on district accomplishments and needs should be communicated to each parent organization.

b. Method to be Used.

(1) Appointment of the Advisory Council to be made from the parents of the children enrolled at the school. Appointments to be ap-

proved by parent organization at the school.

(2) The administrative staff shall work together to provide information for booklets to be edited by the Director of Public Relations and printed by the district's printing department. The booklets shall be distributed to parents with the first report cards.

(3) Development of the Area Council, which would also hopefully include teachers and administrators, will depend on the degree of interest by participating schools.

c. The Cost Factors—

(1) Cost of the booklets can be estimated at about $2,000; this is necessarily a preliminary estimate.

(2) The School Board recommends that the annual district meeting be a dinner meeting with a meal served at a school cafeteria. Participants can help defray this cost which should not exceed $200.

B. *An Evaluation of the School District Plan.*

It is clear to this Court that the Rockford School Board, mindful of its affirmative duty to comply with the dictates of the United States Constitution' and the State of Illinois' school desegregation policy, has submitted its plan to solve minority isolation and the problems attendant to that condition. The Rockford School Board has adroitly articulated the benefits inherent in their plan. Many of the programs which the School Board has suggested implement-

ing in its desegregation plan allegedly have, on a smaller scale, a record of proven performance.

The School Board has operated a special interest center for many years, called the Environmental Education Center.[18] This program has been set up by the Board for students in the fifth and sixth grades within the District to attend the center for two and one half days each year. This program allegedly has been a fully integrated program and has been designed so that at any period of time there has been a mixture of schools with high and low minority enrollment in the program so that it presents an experience in integration as well as an experience in environmental education. This program has required that parents pay a fee which is to cover the cost of the food furnished to the children during their stay at the Environmental Education Center. The parents and guardians of any child are given the right to withdraw their child from the Environmental Education program. Despite the requirement of making payment and despite the right of withdrawal, only a very small percentage of children have been withdrawn and the involvement in the programs exceeds 90% of the children in the Rockford School District. Based on this experience, it is the opinion of the School Board that the parents and guardians who will take the affirmative step to file a written request for withdrawal of their child from any desegregation program will be miniscule.

The School Board's alternative school program which was established beginning with the year 1973–1974 has alleg-

18. Under the School Board's desegregation plan special interest centers would be established which would assign students in grades three through six to buildings in which special programs in reading and language arts, science and mathematics, social studies, environmental education, health and safety or living arts, will be presented for a total of 15 days during the school year. These centers will be completely integrated schools. The School Board contends that it is agreed by all parties that such special interest centers would be educationally of great benefit to the students participating, and in addition, would also foster the integration effort of the Rockford school system. The School Board has estimated that there will be approximately 15% minority enrollment throughout the year at each of the proposed special interest centers. Also the 15 days of special interest education in an integrated setting represents $\frac{1}{12}$ of the total school time.

edly been a highly successful program both in education and in providing a racial integrated program to those participants.[19] There are at the present time three alternative schools: Lathan Park, Haight Art School and Rockford Alternative Middle School. The program and guidelines presented by the School Board for desegregation calls for establishment of additional alternative schools where sufficient interest has been demonstrated. The School Board believes that at least one additional alternative school may be established in the year 1974–75 based on the present waiting list of in excess of 250 students for enrollment in present alternative schools.

The target school program, according to the School Board, has also had an outstanding record of achievement. These are eight schools in which special programs, teachers and additional money were provided in order to raise the achievement level of those eight schools which were found to have had a low achievement record. By the use of various educational techniques, a lower teacher to pupil ratio, and other innovative educational techniques, the target schools have succeeded in raising the achievement level of their students substantially. All of these schools encompass a comparatively high minority enrollment. The parents of the children who are enrolled in these schools are, according to the School Board, extremely anxious that their children continue to attend the target schools.

The School Board at present is operating a bilingual-bicultural program that is to be expanded as the need arises and which allegedly has been successful. The Rockford Board of Education pass-

---

19. The present enrollment and the racial makeup of the alternative schools that are currently being operated and a projected enrollment of those three schools for the 1974–75 school year is quite encouraging as demonstrated by the following statistics:

*Latham Park School* (Kindergarten through 6th Grade)

Enrollment—125
    White—97=77.60%
    Black—28=22.40%

*Haight Arts School* (Kindergarten through 4th Grade)

Enrollment—103
    White—88=85.43%
    Black—10= 9.70%
  Spanish— 2= 1.94%
   Indian— 2= 1.94%
  Oriental— 1= .97%

*Rockford Alt. Middle School* (7th and 8th Grades)

Enrollment—98
    White—80=81.63%
    Black—15=15.30%
  Spanish— 2= 2.04%
   Indian— 1= 1.02%

*Projected Enrollment—1974–75 School Year*

Latham Park—150 Students (Kdg. through 6th Grade)
Haight Arts —150 Students (Kdg. through 5th Grade)
R.A.M.—100 Students (7th and 8th Grades with a possibility of 25 students in the 9th Grade)
See Exhibit B to the School District's "Comments Concerning Desegregation Proposals" filed May 1, 1974.

ed a voluntary plan for the school year 1973–1974 and the first implementation of that program occurred at the beginning of the school year in September 1973.

This program has allegedly had an impact on the problem of minority isolation and has produced additional racial integration within the Rockford School District.[20] The present proposed plan of the School District will involve the increased implementation of alternative schools, bilingual and bicultural schools, target schools and special interest centers which have been successful and attractive educational programs and which

can allegedly achieve desegregation without mandatory busing.[21] In addition to this, where feasible without undue busing, the School Board has planned that there will be changes made in the attendance units to foster integration.[22]

The School Board plan is alleged to be virtually entirely voluntary and to have a projected student participation for the school year 1974–75 of 14,504 out of 37,291.[23]

The following table is a breakdown of the projected student participation for the 1974–75 school year in the School

20. The School Board has represented to this Court that the current desegregation plan had the following degree of participation:

| | | |
|---|---|---|
| Open enrollment for desegregation | 192 pupils | |
| School Closing | 360 " | |
| Alternative Schools | 340 " | (approx.) |
| Target Schools | 2,260 " | |
| Total | 3,152 | |

The School Board's proposed plan for the 1974–75 school year would have projected pupil participation of 14,504 or a projected increase of 11,352.

———◆———

21. As in any program which involves essentially community-wide participation, the desegregation program of the School Board must have community acceptance. In the election of three Board members on April 2, 1974, the winning candidates ran on a platform of opposition to forced busing. The victory of those three candidates by a substantial margin is a clear indication that the Rockford School District parents, tax-payers, and voters are opposed to a desegregation program that will require mandatory busing outside of the neighborhood schools. The defendant School Board submits that the desegregation guidelines and program of the School Board does have community acceptance and will have community support and community cooperation which is an essential ingredient to success.

22. The School Board has suggested the following possible changes in the attendance boundaries. A boundary change between Dennis School and Stiles School would result in both schools having approximately 50% minority enrollment. Dennis is presently 91% and Stiles 20%. A boundary change

between Lathrop and Evergreen would leave both schools with minority enrollments in excess of 40%. Lathrop is presently 80.3% and Evergreen 5.8%. A change of boundary for Haskell could only be with Jackson School which is across the river, and this adjustment would result in both schools being in excess of 30% minority. Haskell School is now 67.3% and Jackson 1.5%. All of the above boundary changes would require mandatory transportation of the students involved. There are other possible changes of boundaries, however, again, these would result in massive cross-district mandatory transportation and would not contribute significantly to an overall solution of this problem.

23. The School Board has represented that an additional adjunct of the total program will be the establishment of magnet schools as soon as finances become available for such programs. These magnet schools will, of course, be part of the open enrollment program and enrollment on a racially integrated basis in these schools will be encouraged.

Board's Proposed School Desegregation plan: [24]

*Desegregation Participation Summary*
1974–1975 (Projected)

| | |
|---|---|
| Pupils at Special Interest Centers | 11,292 |
| Enrollment at Alternative Bilingual and Bicultural Schools | 400 |
| Projection of voluntary transfers resulting from the open enrollment policy | 552 |
| Enrollment at Alternative Schools | 400 |
| Enrollment at Target Schoo's | 1,860 |
| Total number of pupils participating in the desegregation plan | 14,504 |
| Projected enrollment for 1974–75 | 39,291 |
| Special Education students exempt from participation in desegregation plans because of their special needs | –2,000 |
| Total enrollment eligible for desegregation involvement | 37,291 |

These figures indicate that about 40% of the eligible students in School Dis-

trict 205 will be participating in the School Board's proposed program during the first year of its operation.[25] The School Board is hopeful that additional involvement will take place in future years as parents are made more aware of the various educational opportunities available to their children.

The School Board has identified the approximate cost of its proposed deseg- regation plan and anticipates that with federal funding there will be sufficient funds for the implementation of its program.[26] The School Board has claimed that not only is its program financially feasible and organizationally sound but also and more importantly educationally beneficial and will achieve the desegregation of the School District.

However, while there appears to be advantages to the School Board's plan

24. These statistics have been compiled and projected by the School Board. It appears to this Court that on the whole they are as fair a prediction of the actual figures as possible.

25. In considering these figures it should be taken into account that 37,291 represents a total enrollment eligible. All five of the district's high schools are allegedly in compliance with state standards and their enrollment totals 11,570. If the high school enrollment was subtracted from the total population a figure of 25,721 is the result. Using 25,721 students as a base, the total percent of eligible student involvement in desegregation would be 52%. However, while 52% of the eligible student body is involved in the desegregation plan for at least 1/12 of the school year, only 12% of the students are involved in the integration program for 100% of the school year.

26. The School Board reasons as follows: The current Special Education program will require $520,000 for transportation. In addition, the transportation of students who live more than a mile and a half from public transportation or from their schools will cost $375,000. Current desegregation programs including Muldoon closing, Lincoln Park transfers, alternative schools, Gilford and Auburn exchange and others are a total of $225,000. The administrative costs of these programs is $65,000. The anticipated cost of special interest centers for 15 days with an estimated 11,292 students participating is $200,000. There will be left in the

budget a substantial sum of money which will be used for the expanded open enrollment program. In order to properly staff the special interest centers, it will be necessary to add 18 teachers to the staff and this will result in an additional cost of approximately $180,000. This sum of money is not available within the expected revenues and the 1974–1975 budget apart from Title VII funds. In the event Title VII funds become available through approval of the Board of Education's application for them, there would be sufficient funds to provide for the additional staffing required for the special interest centers. In addition, the Title VII funds would provide funding for the additional teacher training necessary for a complete integration program. Those funds also should take care of the Integration Director who has already been employed by the School Board and who has been working on developing the desegregation programs for the past many months. In the event that Title VII funds are not approved, then the School Board would proceed to request that the community pass a referendum to increase the educational tax rate sufficiently to fund the desegregation program. Apart from the desegregation program, it will be necessary to ask the community to increase both the educational tax rate and the building tax rate. It is apparent that if the desegregation program that is ultimately put into effect is one which the community will accept, then the probability of passing the referendum to increase the educational and building tax rates will be greatly enhanced.

there are some disadvantages and some serious questions as to its feasibility. First, the School Board, in its plan, which is the most specific of all the proposals, does not completely explicitate the details of the plan's implementation. Without a full explicitation of these details of the program it is impossible to fully and properly assess the true benefit of the plan and whether it can succeed in adequately reducing minority isolation. The further delineation of the specifics of the proposed plan should be combined with a reassessment of financing the plan with a view to whether the present budget can support the program without additional sources of revenues.

Second, the vast majority of the School Board's plan involves student participation in special interest centers which only provide integration one twelfth of the time. While special interest centers may be both educationally attractive and sound, it remains to be proved whether they are the best means of sufficiently integrating the School District.

Third, the School Board has failed to adequately state what if any mandatory busing will be required and the necessity for such busing. If any student may voluntarily withdraw from all aspects of the program then the School Board must adequately demonstrate that such a voluntary system will lead to significant reduction of minority isolation.

## II. ROCKFORD EDUCATION ASSOCIATION'S PLAN FOR DESEGREGATION.

A. *The Plan.*

1. *Maintain the five existing high schools with suggested boundary changes.* REA contends that by doing this it can achieve improved minority ratios in all five schools.

In some areas gerrymandering of school boundaries may be required to curtail heavy concentrations of minority groups in any one area. Recognizing the geographical distances of the high schools, REA contends that many students are presently using some means of transportation to attend school. REA feels the indicated boundary changes will not significantly alter this amount of transportation.[27]

2. *Establish middle school attendance centers in each high school area.*

a. Use the following middle schools: Wilson, J. F. Kennedy, Washington, Eisenhower, Lincoln and Roosevelt.

b. Maintain Marsh Elementary School, eliminate the middle school program, and establish Beyer as a middle school. With this change, the School District can maintain a middle school center in each high school attendance zone and reduce the amount of transportation required.

c. Presently, because of location in the high school attendance zone, the REA suggests that Morris Kennedy be continued as a middle school, although the REA strongly recommends it be replaced as soon as possible.

d. Establish a new feeder plan for middle school attendance. These changes will bring about, the REA contends, an improved racial balance in the middle schools.

3. *At the elementary level parent involvement and transportation are a paramount concern.* Also, because of housing patterns in Rockford, the question of minority en-

27. The REA in Exhibit 2 submitted to this Court on April 3, 1974 has demonstrated the five proposed high school boundaries (A designates the attendance zone for Auburn High School; E designates the attendance zone for East High School; G designates the at-tendance zone for Gilford High School; J designates the attendance zone for Jefferson High School; and W designates the attendance zone for West High School). See Appendix A.

rollment is a major issue. With this in mind, the REA plan is:

a. Divide the city into three elementary attendance zones.[28] By designating three main attendance areas, it becomes possible to guarantee more adequate minority enrollments and to minimize the transportation needs.

b. Within each attendance zone, establish a Community Advisory Council. In establishing the Community Advisory Council, the REA recommends that the elementary attendance zones be divided into areas. Community, staff, and student representatives would be chosen to serve on a zone council. Establishing these councils in the elementary zone centers does not preclude participation by the middle school and high school attendance zones as stated in these guidelines.

c. Establish a minimum number of interest centers in each attendance zone. In establishing these interest centers the following should be considered:

(1) suggestions from the area Council;

(2) experience and expertise of the professional staff;

(3) availability of established physical plants (buildings for these centers should be selected on the basis of program needs).

d. Guarantee minority enrollment by altering the enrollment process.

(1) Direct that all elementary schools establish a minority majority percentage enrollment, to be determined by each zone Community Advisory Council.

(2) A child shall be given the opportunity to attend any elementary school in his/her attendance zone.

e. Guarantee parent involvement in the selection of an educational program for their child.

(1) Each family will receive a booklet describing the philosophy and special attributes of each elementary school in their attendance zone.

(2) Parents select the most appropriate school for their child's particular needs. On a priority basis, parents list six schools they would like their child to attend. These choices are sent to the Board of Education by a predetermined date. Vacancies in each building shall be filled as applications are received. Unless otherwise indicated, all elementary students of an individual household will attend the same school. Unless the parent or guardian chooses to have their child participate in the proposed plan, all kindergarten children will attend the school in the area in which they live.

B. *An Evaluation of the REA's Plan.*

The REA has stated that by the very nature of the guidelines submitted earlier they cannot give details of schools or the exact number of pupils needing transportation and to do so would require information not available to REA at this time.

Further, REA contends that a further explicitation of the details of the plan would deny community involvement which is so essential to the success of any plan and an inherent part of the REA plan. Likewise, REA, has not attempted a specific cost analysis since it does not have access to figures and personnel that are available to the School Board. REA, therefore, feels that a cost analysis is the School Board's responsibility. Also REA feels that the economic question should not be the fi-

28. The REA in their Exhibit 1 submitted to this Court on April 3, 1974, has demonstrated where they would draw the boundaries for the three elementary zones, North, Central and South. See Appendix B.

nal *determining factor in whether an ed-ucationally sound plan for integration is adopted or not.*

While the REA plan has some sound educational benefits, the plan as it is presently drafted raises some very serious problems.[29]

First, the REA plan is vague and fails to adequately explicitate the necessary details for implementation. While the REA is afraid to infringe on the putative right of their self-styled "Community Advisory Council", before any plan can be properly assessed and approved there should be some detailed delineation of what immediate plans and changes will be implemented and what their projected effect will be. This lack of essential details makes it virtually impossible to properly assess the REA plan at this time.

Second, some of the changes suggested by REA appear to be educationally and organizationally unsound. For example, the REA recommends closing Beyer Elementary School as part of its plan. Beyer School now has a 34.8% minority enrollment. Beyer School was built as an elementary school and not as a middle school. To change Beyer School into a middle school would again result in a deprivation to those required to attend that school, because to have an educationally sound program, schools should be used as they were built to be used. Beyer School apparently has many deficiencies in its equipment and in its arrangement for its use as a middle school. Thus, there are some serious problems posed by the altered use of Beyer School. Further, the transfer of students from Beyer to another elementary school might well require additional and unnecessary busing.

Third, the REA plan is clearly not a voluntary program and will involve mandatory busing without an adequate showing of the absolute need for such busing. Under the REA plan the selection of a school that a student would attend would be determined by the Community Advisory Council. Assuming new students would be coming into the school system each year, a child, theoretically, could attend six different schools within the attendance zone in six years depending on the luck of the draw and the caprice of the Community Advisory Council.[30] It appears that such Advisory Councils would be nothing more than a mini-school board. The Advisory Council would make student assignments, determine racial quotas, and select the curriculum. The function of the School Board would merely confirm the actions of these Councils. The creation of such Councils might well violate the existing state law. Under Illinois law the School Board is charged with the responsibility of supervising the education of the children within the district, the raising of revenue by tax levy, hiring teachers and maintaining schools. School District #88 v. Kooper, 380 Ill. 68, 43 N.E.2d 542 (1942); see Chap. 122 § 10–20 et seq. of the Ill.Rev.Stat. The School Board is vested with the power to appoint and supervise teachers, to select and assure uniformity of textbooks, to establish attendance units, to control and supervise school buildings and to establish the curriculum to be taught.[31] There is nothing in the statute which authorizes a school board, duly elected by the voters of the school district to delegate its responsibilities and duties in administering a school district to an advisory council. The state legislature vested responsibility for the

29. The REA plan is similar in design to the Detroit and Richmond plans which are of very questionable value as a model for school desegregation.

30. The REA proposal is unclear as to who, if anyone, is to set priority under their pupil selection system.

31. See, e. g., Chap. 122 §§ 10–20.7; 10–20.8; 10–21.1; 10–21.2; 10–22.4; 10–22.5; 10–22.-6; 10–22.10 of the Illinois Revised Statutes.

supervision and maintenance of a school district with the school board and did not authorize the delegation *per se* of its powers to any advisory committee. Board of Education v. Rockford Education Association, 3 Ill.App.3d 1090, 280 N.E.2d 286 (1972); Cf. Reif v. Barrett, 355 Ill. 104, 188 N.E. 889 (1934); Toplis & Harding, Inc. v. Murphy, 384 Ill. 463, 51 N.E.2d 505 (1943).[32] It is also questionable whether such Community Advisory Councils can adequately provide both equal educational opportunities and a truly integrated school system.[33]

Fourth, while pecuniary interests should not be a major obstacle to the implementation of the best school desegregation program in the Rockford School District, it is apparent that part of the assessment of a program will involve its economic feasibility. The REA, if it wishes to develop a more acceptable plan should work with the School Board to determine the economic and practical feasibility of its program.

## III. THE PLAINTIFFS' PLAN FOR SCHOOL DESEGREGATION.

### A. *The Plan*

#### 1. *The Elementary Schools*

a. The plaintiffs endorse the REA plan of three elementary zones. Plaintiffs' plan also includes the REA's proposal of a Community Advisory Council in each zone, to be composed of community, staff and student representatives. This Council must be as representative as possible of all the ethnic, economic and social groups within the zone, and should be subject to confirmation by no other group than the School Board. An appeal process should be built into creation of the Council, to insure broad representation.

b. Plaintiffs further endorse the REA plan for development of unique programs in each of the elementary schools within each zone. This would permit parents to submit six ranked choices for enrollment of their children. The Advisory Council would determine a maximum minority enrollment for each school.

c. Plaintiffs urge that many unique approaches to teaching the commonly accepted elementary curriculum be developed by the staff and parent group of each elementary school. Such approaches may include, but should certainly not be limited to: a bilingual school, science and environmental education specialty, science-math specialty, fine arts emphasis, language experience emphasis, independent study learning center emphasis, student government emphasis, performing arts emphasis, etc.

d. Plaintiffs suggest the Environmental Education Center at New Milford be continued as a residential center for enriched science and environmental studies. The plaintiffs prefer, if a center is to be cre-

---

32. In fact the School Board is authorized to employ a superintendent who has charge of the administration of the school under the direction of the board of education. See Chapter 122 § 10–21.4 of the Ill.Rev.Stat.

33. In opposition to this plan the School Board contends that, if the parents are to have a choice, then it is quite apparent from past history that they will probably opt for no busing of their children out of neighborhood schools. The comment of Mr. Oscar Blackwell, the School District's Integration Director, who is a black and who has been concerned with the desegregation movement, was that he would forsee under this type of arrangement that the blacks and minorities would be put in a position to be involved in one-way busing if they want to be in a school other than their present neighborhood schools. As a general proposition, the School Board contends that the parents of white children have not elected to have them bused out of their neighborhood schools, and as a matter of fact, as a general proposition, neither have the black parents elected to have their children bused out of their neighborhood schools. As a practical matter, therefore, there is no assurance whatsoever that there will be any desegregation accomplished by the REA plan, and if any is accomplished, it might only be a one-way busing proposition for black children.

ated for periodical day programs of special emphasis, that the center be devoted to fine arts, and that this center, as in Dayton, be utilized for a special after school program as well. Plaintiffs urge transportation be provided to this after school center from all parts of the city for the children of working parents. A single center should be centrally located. However, a case could be made for an after school arts center in each elementary zone. Census studies show that probably 10,000 pupils of the Rockford District, aged six to thirteen, are from families where both parents work, or where there is a single-parent head of the household.

2. *Middle Schools*

a. Plaintiffs have assigned middle schools with sufficient capacity to each of the elementary zones to provide space for the estimated number of middle school students. Where several middle schools will serve a given zone, plaintiffs have not made an attempt to indicate how middle school students shall be assigned to a given building. Plaintiffs are willing to attempt analysis of this sort, if desired. However, it is plaintiffs' feeling that middle school attendance should be based on elementary school attended, rather than residence. This will guarantee that the elective process for a choice of elementary school will still provide the individual student with a continuity of classmates (and parent groups, with a dependable progression of co-workers) throughout his school career.

b. In addition, plaintiffs have placed sixth graders in middle schools city-wide. Plaintiffs call for the implementation of the middle school concept, in full, as provided at the time of the conversion from a junior high program to middle schools. The concept was adopted because of deep concerns for the sophisticated educational needs of today's sixth graders, which could be more readily met in a middle school setting, with more elective classes. If this concept was viable in 1969, it is all the more so today. If it is viable for a large proportion of the sixth graders of the West Side, it is equally viable for all the sixth graders of Rockford. Plaintiffs use of the existing buildings provides for accommodating the increased number of middle schoolers.

c. By reducing the number of resident students in Lincoln Middle School, plaintiffs feel sufficient space should be created for additional rooms devoted to elective subjects, i. e., shop, home economics, art, music, language, etc. The middle schoolers in the four satellite buildings in the park could shuttle to Lincoln for part of each day for elective work in the added space, also for use of cafeteria, if needed, and expanded library facilities; plus use of pool. Equipment could be purchased under Title VII. A director of the entire park should be employed, in addition to building principals, who would remain if they desired to work with this age group.

d. In addition, the park offers an unparalleled opportunity for an after school program for the children of working parents who attend (offered also to other young people on a space-available basis). With five gyms, one pool, five playgrounds, and special interest rooms. Plaintiffs recommend such an after school program be established. Coordination and possible joint funding with the Park District should be explored. It is suggested that Haight Elementary School should be employed in a similar manner and relationship to the John F. Kennedy building, to accommodate additional middle school students.

### 3. *High Schools*

a. Plaintiffs suggest that assignment to high schools follow in a steady progression based on the elementary school elected for attendance, rather than residence.

b. Plaintiffs also believe the district is now ready for a full scale citizens' study of building needs for the next ten years. Plaintiffs regret, with the REA, that plaintiffs were not able to recommend the closing of Morris Kennedy Middle School, since it seems to be the desire of many knowledgeable persons. Long-range demographic studies need to be done, and more information on the high school situation than was available to plaintiffs needs to be provided. Plaintiffs will be willing, as always, to work diligently toward constructive remediation.

### B. *Evaluation of the Plaintiffs' Plan.*

Since the plaintiffs' plan relies heavily on the plan of the REA, the evaluation of the REA plan is also applicable to plaintiffs' plan. The plaintiffs' plan lacks the essential details and cost analysis necessary for proper evaluation. Also, the plaintiffs' plan, like the REA plan, poses serious problems of feasibility and the legality of the Community Advisory Councils.[34]

### IV. THE DEFENDANT-INTERVENORS' COMMENTS.

While the defendant-intervenors did not submit a plan for school desegregation, they did submit their comments on the various proposed plans.

The following is the major thrust of the defendant-intervenors' comments:

1. The defendant-intervenors seek a workable and effective voluntary desegregation proposal.

2. Each of the parties in their proposals have failed to demonstrate the economic feasibility, workability and reasonableness of their plans.

3. Since the plaintiffs have objected to every desegregation proposal submitted by School District #205 the Court should allow this cause of action to proceed to trial on the merits without passing upon the acceptability of any of the proposals submitted to the Court.

4. This Court should invoke its power as a chancellor in equity and approve a voluntary desegregation plan.

■■ It is the opinion of this Court, after carefully examining the proposed plans and comments of the respective parties and the voluminous materials filed in support of their respective plans, that no plan to date is sufficiently developed and documented to be deemed an acceptable and ultimate plan for school desegregation in the School District. All plans lack an extensive study of their long and short range operational feasibility and their cost and funding potential. Without such a study and a fuller explicitation of the specifics of the plans, it is impossible for this Court to properly assess their true educational benefits and ability to lead to significant school integration. It is vital that

---

34. For example, according to the School Board the plaintiffs' plan to put all sixth graders into the middle schools overlooks the fact that there is not adequate space to house all sixth graders in the middle schools. Also, the suggestion for a "Lincoln Educational Park" would involve five schools and 3,450 students and would require shuttling of students to Lincoln Middle School for part of each day to receive the use of the cafeteria, library facilities, pool, shop courses and other curriculum students take in middle school. Shuttling 3,450 children between Lincoln Middle School and four oth-

er schools would require a massive amount of busing and interrupt the children's education constantly throughout the day. Since Lincoln Middle School can only house a small proportion of the 3,450 students at one time, it is apparent that there would be a great amount of coming and going, all of which would interfere with education and increase the cost without any benefit whatsoever. The practical problem of lack of lockers for the children who are shuttled in and out of Lincoln Middle School is a detriment to proper educational process.

any plan which is to be implemented must not only be operationally and economically feasible but also must maintain and to the degree necessary upgrade, the quality of education for all children in the School District.

■ It must be remembered that an integrated school system does not mean, and indeed could not mean, in view of the residential patterns of most of our major metropolitan areas, that every school must in fact be an integrated unit. A school which happens to. be all or predominantly white or all or predominantly black is not a "segregated" school in an unconstitutional sense if the system is a genuinely integrated one and there are equal educational opportunities provided to all students. The goal is equal educational opportunities and not the mere shuffling of students.

From the facts set forth above there appear to be problems of underachievers, a high number of drop-outs, poor facilities and supplies in certain Rockford schools which have a high percentage of minority students. These problems might very well be related and to some extent caused by minority isolation. Further, School District #205 presently fails to comply with the state standards. relating to minority integration.

This Court has been encouraged by the willingness and devotion of the parties, especially the School Board, in attempting to develop a program that will comply with the state standards and solve the problem of minority isolation. Thus it is the opinion of this Court that at this time it would not be appropriate for the Court to become an activist and formulate a program of integration for the School District.[35]

■ It appears to this Court that the wiser course of action lies in permitting the parties to further develop, delineate, amend and study their respective school desegregation plans in light of the principles and comments stated above so that an intelligent and informed decision can be made as to which program would most practically and efficiently eliminate minority isolation and its ill effects. It is obvious that the instant ruling will *de facto* allow the School Board to go ahead and implement its 1974–75 school desegregation plan. Such action by the School Board should have the beneficial result of providing in 1974–75 an empirical insight into what effect the different programs in the School Board's plan had on the problem of minority isolation. These insights might well guide the parties and this Court in determining what would be the best school desegregation program for the School District. The School Board's desegregation plan was by far the best developed, documented and presented of all the proposals. Also the voluntary nature of the School Board's plan appears to allow beneficial experimentation without inflicting forced cooperation. Thus, in the first part of 1975 this Court will review not only the well developed and documented proposals of the parties but also will examine the progress of the School Board's plan.

At that time the Court will be better able to determine the appropriate course of action in order to insure the swift but just elimination of minority isolation and its ill effect from the Rockford School System.

Accordingly, it is hereby ordered that the parties, in cooperation with the

35. It is well settled that once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies. See Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mold each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and prac-

ticality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims. In the instant action it is clear to this Court that the School Board and other parties as members of the community who are intricately involved in the educational process are best able at this stage to attempt to develop an acceptable school desegregation program and it would be inappropriate and counter-productive at this time to have the Court *sua sponte* develop its own program.

School Board, have until March 1, 1975 to further develop or amend their respective plans and to conduct more extensive factual and statistical analysis of their plans especially in regard to their operational and economic feasibility. Further, the parties will present their carefully drawn plans and a report on the progress of the School Board's efforts at the 1975 Spring Term of the Court in Freeport, Illinois.

Appendix A

Appendix B

